**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| INTERNATIONAL PAINTERS AND ALLIED TRADES INDUSTRY PENSION FUND<br>1750 New York Avenue, N.W.<br>Washington, DC 20006-5387 | )<br>)<br>)<br>)<br>) |
|          Plaintiff,<br>   v. | ) CIVIL ACTION NO. 1:07-cv-01906 (JR)<br>)<br>) |
| DEWAYNE CUSTOM PAINTING, INC.<br>a/k/a Custom Painting | )<br>)<br>) |
|    and | )<br>) |
| DEWAYNE BRAITHWAITE, individually and<br>d/b/a Dewayne Custom Painting, Inc.<br>a/k/a Custom Painting | )<br>)<br>)<br>) |
|         Defendants. | )<br>) |

**MOTION FOR JUDGMENT BY DEFAULT
AGAINST DEFENDANTS, DEWAYNE CUSTOM PAINTING, INC. AND
DEWAYNE BRAITHWAITE**

Plaintiff, International Painters and Allied Trades Industry Pension Fund, respectfully moves this Court for entry of judgment by default against Defendants, Dewayne Custom Painting, Inc. ("Company") and Dewayne Braithwaite ("Braithwaite", and with Company, "Defendants") in the amount of $11,076.74. On February 18, 2008, Plaintiff filed with the Clerk of the Court a Request to Enter Default against Defendants pursuant to Federal Rule of Civil Procedure 55(a). Default was subsequently entered on February 19, 2008.

Accompanying this motion are a supporting memorandum of points and authorities, the Declaration of Thomas C. Montemore (attached as Exhibit 1), the Declaration of Jennifer L.

191755-1

Hope (attached as Exhibit 2), and a proposed default judgment.

Respectfully submitted,

JENNINGS SIGMOND, P.C.

 /s/ Kent Cprek
KENT CPREK
Bar No. 478231
JENNIFER L. HOPE*
The Penn Mutual Towers, 16th Floor
510 Walnut Street, Independence Square
Philadelphia, PA 19106-3683
(215) 351-0615/0617
Attorneys for the Fund

Date: March 18, 2008

*Application for Pro Hac Admission of Jennifer L. Hope shall be made at the appropriate time.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| INTERNATIONAL PAINTERS AND ALLIED TRADES INDUSTRY PENSION FUND 1750 New York Avenue, N.W. Washington, DC 20006-5387 | ) ) ) ) ) |
| Plaintiff, | ) CIVIL ACTION NO. 1:07-cv-01906 (JR) |
| v. | ) ) |
| DEWAYNE CUSTOM PAINTING, INC. a/k/a Custom Painting | ) ) ) |
| and | ) ) |
| DEWAYNE BRAITHWAITE, individually and d/b/a Dewayne Custom Painting, Inc. a/k/a Custom Painting | ) ) ) ) |
| Defendants. | ) ) |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S**
**MOTION FOR JUDGMENT BY DEFAULT AGAINST DEFENDANTS, DEWAYNE**
**CUSTOM PAINTING, INC. AND DEWAYNE BRAITHWAITE**

Plaintiff, International Painters and Allied Trades Industry Pension Fund (the "Pension Fund"), is entitled to an Order entering judgment by default against Defendants, Dewayne Custom Painting, Inc. ("Company") and Dewayne Braithwaite ("Braithwaite", or together with Company, "Defendants"), in the amount of $11,076.74.

The Pension Fund served its Complaint on Defendants on January 26, 2008. To date, Defendants have failed to answer the Amended Complaint or to otherwise defend this action. Plaintiff filed a Request to Clerk to Enter Default against the Defendants pursuant to Fed. R. Civ. P. 55(a) on February 18, 2008. Default was entered against the Defendants on February 19, 2008. Plaintiff now submits its memorandum in support of its motion for entry of judgment by default.

191755_1.DOC

In light of Defendants' default and Defendants' continuing failure to appear or otherwise defend this action, the Pension Fund is entitled to judgment by default against Defendants without a hearing. Fed. R. Civ. P. 55(b); <u>United States v. De Frantz</u>, 708 F.2d 310 (7th Cir. 1983); <u>Draisner v. Liss Realty</u>, 211 F.2d 808 (1954). Where a Defendant(s), such as the Defendants here, fails to respond to the Complaint, all factual allegations in the Complaint are deemed admitted. <u>Thomson v. Wooster</u>, 114 U.S. 104 (1885); <u>Au Bon Pain Corp. v. Artect, Inc.</u>, 653 F.2d 61 (2d Cir. 1981); <u>U.S. ex. Rel. v. Carr</u>, 567 F.Supp. 831, 840 (W.D. MI 1983). General allegations of fact are also deemed true. <u>Danning v. Lavin</u>, 572 F. 2d 1386, 1388-89 (9th Cir. 1978) (allegations of insolvency pled in general terms held sufficient to support a finding of fraudulent conveyance or voidable preference).

Defendants are and have been party to a collective bargaining agreement(s) (singly or jointly, "Labor Contract") with the various local unions and district councils affiliated with the International Union of Painters and Allied Trades, AFL-CIO-CFC ("International" or "Union"), including District Council 51 ("DC 51"). <u>See</u> Exhibit 1("Montemore Decl.") ¶ 5. Under the Labor Contract, Defendants are required to remit fringe benefit contributions and other sums to Plaintiff. Defendants have failed to pay all required contributions and costs as required under the Labor Contract. Montemore Decl. ¶ 6. The failure to pay these fringe benefit contributions and other amounts results in a delinquency to the Plaintiff. Montemore Decl. ¶ 10.

<u>**ARGUMENT**</u>

A.    <u>**ENTRY OF JUDGMENT AGAINST DEFENDANTS FOR UNPAID
       CONTRIBUTIONS, INTEREST, LIQUIDATED DAMAGES AND
       ATTORNEYS' FEES AND COSTS IS APPROPRIATE**</u>

      1.    **Company is Bound by the Terms and Conditions of a Collective
              Bargaining Agreement with the Union.**

Company is a party to a Labor Contract with the Union. Montemore Decl. ¶ 5. The

Labor Contract provides for the payment of contributions to the Pension Fund for time worked

by or paid to employees who perform work covered by its terms and conditions. Montemore

Decl. ¶ 6. Failure to make these contributions, or to submit either incorrect or late remittance

reports, results in a delinquency to the Pension Fund. Montemore Decl. ¶¶ 6, 10. Under the

Labor Contract, the Pension Fund also has the right to audit the signatory's payroll books and

related records to determine that all of the required contributions have been paid. Montemore

Decl. ¶ 10. Finally, under the terms of the Labor Contract, the employer agrees to be bound by

the Trust Agreement and the International Painters and Allied Trades Industry Pension Plan

("Plan") (attached as Exhibit 2 to the Complaint filed in this matter and incorporated by

reference) and by all amendments thereto and actions taken by the trustees of the Pension Fund.

Montemore Decl. ¶ 6.

      Additionally, Section 515 of the Employee Retirement Income Security Act ("ERISA"),

29 U.S.C. § 1145, provides:

              Every Employer who is obligated to make contributions to a
              bargained agreement shall ... make contributions in accordance
              with ... such agreement.

If an employer fails to make the contributions as required by the collective bargaining agreement

and Section 515 of ERISA, then the employer is subject to the provisions of Section 502(g)(2) of

ERISA, 29 U.S.C. § 1132(g)(2). Section 502(g)(2) provides for the mandatory award of the

following if a judgment is entered in the Pension Fund's favor pursuant to Section 515:

A.    the unpaid contributions;

B.    interest on the unpaid contributions;[1]

C.    an amount equal to the greater of:

(i)    interest on the unpaid contributions; or

(ii)    liquidated damages provided for under the plan in an
amount not in excess of 20 percent (or such higher
percentage as may be permitted under Federal or State law)
of the amount determined by the Court under subparagraph
(a);[2]

D.    reasonable attorneys' fees and costs of the action, to be paid by the
Defendants; and

E.    such other legal or equitable relief as the court deems appropriate.

As stated above, Defendants have failed to submit contributions for the period of

September 2006 through May 2007 in violation of the Labor Contract and ERISA. Montemore

Decl. ¶ 7. As a result, Plaintiff is entitled to judgment in at least the amount of $11,076.74.

### a. Defendants owe fringe benefit contributions in the amount of $5,946.00.

Defendants have failed to timely remit to the Pension Fund contributions for the period of

September 2006 through May 2007 in the amount of at least $5,946.00. This amount is based on

an audit performed as well as remittance reports submitted by Defendants. Montemore Decl. ¶ 7.

---

[1]    Section 10.12(b)(2) of the Plan sets the interest rate on delinquent contributions according to the
Internal Revenue Service rate for delinquent taxes. See Complaint, Exhibit 2.

[2]    ERISA and § 10.12(b)(3) of the Plan's rules and regulations mandate that liquidated damages be
awarded in an amount equal to the greater of interest or 20% of unpaid contributions due at the commencement of
the lawsuit and those which become delinquent during the course of the litigation. See Complaint, Exhibit 2. Article
VI, Sec. 4 of the Trust Agreement also provides for the assessment of liquidated damages on contributions paid after
the due date. See Complaint, Exhibit 1.

        c.      **Defendants owes interest through March 15, 2008 in the amount of $438.41.**

Section 10 of the International Painters and Allied Trades Industry Pension Plan ("Plan") (attached as Exhibit 2 to the Complaint filed in this matter and incorporated by reference) sets the interest rate on delinquent contributions according to the Internal Revenue Service rate for delinquent taxes. Interest accruing through March 15, 2008 on Defendants' delinquent contributions totals $483.41. Montemore Decl. ¶ 8. Interest shall continue to accrue on unpaid contributions in accordance with the Plan and ERISA until the date of actual payment. 29 U.S.C. § 1132(g)(2); 26 U.S.C. § 6621.

        d.      **Defendants owes liquidated damages in the amount of $1,189.20.**

ERISA and § 10.12(b)(3) of the Plan's rules and regulations mandate that liquidated damages be awarded in an amount equal to the greater of the interest on the unpaid contributions or 20% of all unpaid contributions. 29 U.S.C. § 1132(g)(2)(C). Article VI, Sec. 4 of the Pension Fund's Trust Agreement (attached as Exhibit 1 to the Complaint filed in this matter and incorporated by reference) also provides for the assessment of liquidated damages on contributions paid after the due date. As indicated above, Defendants owes $5,946.00 in unpaid contributions. Montemore Decl. ¶ 7. Twenty percent (20%) of Defendants' unpaid contributions is $1,189.20. The total amount of liquidated damages is greater than the interest due. Therefore, Defendants owes liquidated damages in the amount of $1,189.20 as twenty percent (20%) of Defendants' delinquent contributions is greater than the interest. Montemore Decl. ¶ 9.

        e.      **Defendants owe attorneys' fees and costs in the amount of $3,503.13.**

Plaintiff has incurred $3,503.13 in attorneys' fees and costs in connection with this matter through March 7, 2008. See, Exhibit 2 ("Hope Decl.") ¶ 2; Exhibit 3. The Pension Fund is

entitled to reimbursement of all attorneys' fees and costs it incurs in connection with the enforcement and collection of any judgment entered by the Court. See Trucking Employees of North Jersey Welfare Fund, Inc. v. Bellezza Co., 57 Fed. Appx. 972 (3d Cir. 2003); Free v. Briody, 793 F.2d 807 (7th Cir. 1986); Sheet Metal Workers Health and Welfare Trust Fund v. Big D Service Co., 867 F.2d 852 (10th Cir. 1989); 29 U.S.C. § 1132(g)(2)(D).

## 2.    The Pension Fund is entitled to injunctive relief

The failure of Defendants to comply with its contractual and statutory obligations results in a substantial adverse impact on the Pension Fund's ability to meet its legal obligations. Montemore Decl. ¶ 11. The Pension Fund is obligated by express mandates of ERISA and by the documents and instruments by which it is administered to provide benefits and pension credits to all of Company's employees who are otherwise eligible to receive them. Montemore Decl. ¶ 11; 29 C.F.R. 2530-200b-2(a)(1) and (2); Central States, S.E. & S.W. Areas Pension Fund v. Admiral Merchants Motor Freight, Inc., 511 F.Supp. 38 (D.Minn. 1980), aff'd sub. nom., Central States, S.E. & S.W. Areas Pension Fund v. Jack Cole-Dixie Highway Co., Inc., 642 F.2d 1122 (8th Cir. 1981). The Pension Fund is required to provide these benefits and credits regardless of whether Defendants make the contributions. Montemore Decl. ¶ 11. For example, if employees perform work covered by the collective bargaining agreement, the Pension Fund has affirmative obligations to credit hours for retirement benefits regardless of whether a signatory employer makes contributions to the Pension Fund. The result of Company's non-compliance with ERISA and the Labor Contract is a significant drain on the Pension Fund's resources. Montemore Decl. ¶ 11.

Additionally, where, as here, Defendants fails to remit its contributions, the Pension Fund loses the income that it would have earned by investing those contributions. Montemore Decl. ¶

11. Combining this loss of investment income with the Pension Fund's requirement to continue paying benefits to Company's employees (as well as to the employees of other signatory contractors) will eventually affect the actuarial soundness of the Pension Fund as well as deplete the resources available to pay current pension benefits. Montemore Decl. ¶ 11.

Furthermore, the Pension Fund incurs additional administrative expenses as a result of Defendants' failure to pay its contributions. These losses and added expenses significantly impair the Pension Fund's ability to continue to provide benefits to not only Company's employees, but also to employees of companies that comply with their contractual obligations. In light of Defendants' failure to comply with its contractual and statutory obligations to the Pension Fund to submit timely, accurate remittance reports and pension contributions each month, and the irreparable harm which Defendants' malfeasance causes the Pension Fund, the Pension Fund respectfully requests the injunctive relief which is set forth in its proposed default judgment. Laborers' Fringe Benefit Funds v. Northwest Concrete, 640 F.2d 1350, 1352 (6th Cir. 1981); IBPAT Union and Industry Pension Fund v. Hartline-Thomas, Inc. , 4 EBC 1199, 1200 (D.D.C. 1983); Teamsters Local 639 - Employers Trust v. Jones & Artis Construction Co., 640 F.Supp. 223 (D.D.C. 1986).

[INTENTIONALLY LEFT BLANK]

## CONCLUSION

Plaintiff, thus, requests that the Court enter a judgment against Defendants, Cobra Painting Company, Inc. ("Company" or "Defendants") in the amount of $49,574.14 and, in light of the clear statutory intent of ERISA, it is further requested that this Court grant the Pension Fund all other relief to which it may be entitled under applicable law and as requested in the Motion for Default Judgment.

Respectfully submitted,

JENNINGS SIGMOND, P.C.

/s/ Kent Cprek
KENT CPREK (Bar No. 478231)
JENNIFER L. HOPE*
The Penn Mutual Towers, 16th Floor
510 Walnut Street, Independence Square
Philadelphia, PA 19106-3683
(215) 351-0615/0617
Date: March 18, 2008              Attorneys for the Fund

*Application for Pro Hac Admission of Jennifer L. Hope shall be made at the appropriate time.

191755-1                              8

## CERTIFICATE OF SERVICE

I, JENNIFER L. HOPE, ESQUIRE, state, under penalty of perjury, that the foregoing

Motion for Judgment by Default pursuant to Federal Rule of Civil Procedure 55(b)(2) against

Defendants was served by mailing same first class mail, postage prepaid, on the date listed below

to:

Dewayne Custom Painting
6770 Glen Albin Rd.
LaPlata, MD 20646

Dewayne Braithwaite
6770 Glen Albin Rd.
LaPlata, MD 20646

BY:    s/Jennifer L. Hope
       JENNIFER L. HOPE

Date:  March 18, 2008

191755-1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| INTERNATIONAL PAINTERS AND ALLIED TRADES INDUSTRY PENSION FUND<br>1750 New York Avenue, N.W.<br>Washington, DC 20006-5387<br><br>          Plaintiff,<br>   v.<br><br>DEWAYNE CUSTOM PAINTING, INC.<br>a/k/a Custom Painting<br><br>    and<br><br>DEWAYNE BRAITHWAITE, individually and<br>d/b/a Dewayne Custom Painting, Inc.<br>a/k/a Custom Painting<br><br>          Defendants. | )<br>)<br>)<br>)<br>)<br>) CIVIL ACTION NO. 1:07-cv-01906 (JR)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## ORDER AND JUDGMENT BY DEFAULT AGAINST DEFENDANT, DEWAYNE CUSTOM PAINTING, INC. AND DEWAYNE BRAITHWAITE

Upon consideration of the Complaint and Motion for Entry of Judgment by Default of the Plaintiff, International Painters and Allied Trades Industry Pension Fund ("Fund," "Pension Fund" or "Plaintiff"), it appears to the Court that Defendants, Dewayne Custom Painting, Inc. a/k/a Custom Painting ("Company") and Dewayne Braithwaite d/b/a Dewayne Custom Painting, Inc. a/k/a Custom Painting ("Braithwaite," and together with Company, "Defendants") have willfully failed to appear, plead or otherwise defend this action, and it is ORDERED:

1.      Plaintiff's Motion is **GRANTED**;

2.      Judgment is entered against Company and in favor of Plaintiff in the total amount of $11,076.74 itemized as follows:

191755-1

(a)    Unpaid contributions for the period of September 2006 through May 2007 in the amount of $5,946.00 under 29 U.S.C. § 1132(g)(2)(A);

(b)    Interest from the date contributions became due through March 15, 2008 in the amount of $438.41;

(d)    Liquidated damages in the amount of $1,189.20, as provided for under 29 U.S.C. § 1132(g)(2)(C). (As indicated above, Defendants owe $5,946.00 in unpaid contributions. Twenty percent (20%) of this amount is $1,189.20. The total amount of liquidated damages is greater than the interest due. Therefore, Defendants owes liquidated damages in the amount of $1,189.20).

(e)    Attorneys' fees and costs in the amount of $3,503.13 incurred by Plaintiff through March 7, 2008 as provided in 29 U.S.C. § 1132(g)(2)(D).

3.    Defendants, its owners, officers, agents, servants, attorneys and all persons acting on their behalf or in conjunction with them shall be and hereby are restrained and enjoined from refusing to file complete, proper and timely remittance reports with accompanying pension contributions for all periods for which Defendants are obligated to do so under its collective bargaining agreement(s).

4.    If further action by the Pension Fund is required to obtain payment of the amounts owed by Defendants, it may apply to this Court or to the court in which enforcement is sought, for such further reasonable attorneys' fees and costs in addition to those set out in Paragraph 2(d) above. See Trucking Employees of North Jersey Welfare Fund, Inc. v. Bellezza Co., 57 Fed. Appx. 972 (3d Cir. 2003); International Painters and Allied Trades Industry Pension Fund v. H.W. Ellis Painting Co., Inc., No. 03-1125, slip. op. at *3 (D.D.C. February 10, 2004)

(citing Free v. Briody, 793 F.2d 807 (7th Cir. 1986); Sheet Metal Workers Health and Welfare Trust Fund v. Big D Service Co., 867 F.2d 852 (10th Cir. 1989)).

5.      Within twenty (20) days of the entry of this Order, Defendants shall fully and accurately complete and submit to the Plaintiff any and all outstanding remittance reports, including but not limited to reports and contributions for the period September 2006 through May 2007, together with a check for the full amount due and owing, including unpaid contributions, interest, liquidated damages and attorney's fees and costs.

6.      Plaintiff shall have the right to conduct future audits for all relevant periods, including the time periods covered by this judgment. Defendants shall be and hereby is restrained and enjoined from failing and refusing to submit to such audits by certified public accountants selected by Plaintiff and shall produce all payroll books and related records requested by Plaintiff, including, but not limited to, payroll, wages, general ledger and cash disbursement records, compensation insurance audits and any other pertinent records deemed necessary for the purpose of ascertaining and/or verifying payments and/or liabilities to Plaintiff. Defendants shall pay Plaintiff any additional amounts found owing, plus such other amounts as set forth in the Agreement, the Agreement and Declaration of Trust of the Pension Fund, the International Painters and Allied Trades Industry Pension Plan, ERISA or any other applicable law.

7.      If additional delinquencies are discovered pursuant to the submission of the remittance reports or to the audit referred to above, or as a result of additional information that becomes available to the Plaintiff, the Plaintiff may apply to the Court for an additional or supplemental judgment reflecting any additional delinquencies, interest, liquidated damages,

attorneys' fees and costs, pursuant to ERISA, 29 U.S.C. § 1132(g)(2) together with any audit costs incurred by the Plaintiff.

9.      Plaintiff is awarded reimbursement of all additional attorneys' fees and costs it incurs in the collection and enforcement of this judgment as well as those incurred in the collection of delinquent contributions which may be found to be due as a result of the audit provided for in this Order.

10.     If Defendants fails to comply with any of the terms of this Order, the Plaintiff may, in addition to pursuing the remedies provided for under Federal Rule of Civil Procedure 69, reopen this case upon motion to the Court and notice to the Defendants, and may at that time ask for further appropriate monetary and/or injunctive relief.


_____ J.
James Robertson
United States District Judge

Date:_____

Copies of this Default Judgment shall be sent to:

Jennifer L. Hope, Esquire
Jennings Sigmond, P.C.
The Penn Mutual Towers, 16th Floor
510 Walnut Street, Independence Square
Philadelphia, PA 19106-3683

Dewayne Custom Painting
6770 Glen Albin Rd.
LaPlata, MD 20646

Dewayne Braithwaite
6770 Glen Albin Rd.
LaPlata, MD 20646

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| INTERNATIONAL PAINTERS AND ALLIED TRADES INDUSTRY PENSION FUND<br>1750 New York Avenue, N.W.<br>Washington, DC 20006-5387<br><br>                        Plaintiff,<br>    v.<br><br>DEWAYNE CUSTOM PAINTING, INC.<br>a/k/a Custom Painting<br><br>      and<br><br>DEWAYNE BRAITHWAITE, individually and<br>d/b/a Dewayne Custom Painting, Inc.<br>a/k/a Custom Painting<br><br>                    Defendants. | )<br>)<br>)<br>)<br>)<br>) CIVIL ACTION NO. 1:07-cv-01906 (JR)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

### DECLARATION OF THOMAS C.  MONTEMORE

THOMAS MONTEMORE states and declares the following:

1.     My name is Thomas C. Montemore and I am the Assistant to the Fund Administrator of the International Painters and Allied Trades Union and Industry Pension Fund ("Pension Fund", "Fund" or "Plaintiff"). I have held that position since February 1, 2000. I served as Delinquency Controller from 1988 through October 31, 2000 and I have served as the Delinquency Coordinator from 1986 to 1988, and before that, acted as Agreement Clerk from 1982 to 1986, and File Clerk beginning in 1979.

2.     The Pension Fund is an "employee benefit pension plan" as defined in Section 3(2)(A)(i) of ERISA, as amended, 29 U.S.C. §1002(A)(i), established by the International Union of Painters and Allied Trades, AFL-CIO-CFL ("Union"), and employers in private industry



PLAINTIFF'S EXHIBIT
1

whose employees are members of or otherwise represented by the Union and its district councils and local unions, for the purpose of providing retirement income to the employees. The Pension Fund is administered in the District of Columbia from its and my principal place of business at 1750 New York Avenue, N.W., Washington, D.C. 20006.

3.      I have personal knowledge of the contents of the collective bargaining agreements, the Agreement and Declaration of Trust ("Trust Agreement") and the International Painters and Allied Trades Industry Pension Plan ("Plan") referenced in this Motion.

4.      The Pension Fund, as part of its normal operating procedure, maintain files containing copies of the collective bargaining agreements signed by each employer and copies of the remittance reports submitted by each contributing employer. The Pension Fund also maintains, as part of its normal operating procedures, a record of all contributions which are paid to the Pension Fund by each contributing employer, including copies of checks submitted directly from employers as payment for contributions due.

5.      My review of the regular business records maintained by the Pension Fund reveals that the defendants, Dewayne Custom Painting, Inc. a/k/a Custom Painting ("Company") and Dewayne Braithwaite d/b/a Dewayne Custom Painting, Inc. a/k/a Custom Painting ("Braithwaite" or "Individual Defendant" and together with Company, "Defendants"), are a contributing employer of the Pension Fund and are bound to a collective bargaining agreement ("Labor Contract") with the International Union of Painters and Allied Trades, AFL-CIO, CLC. A true and correct copy of the Labor Agreement is attached herein as Exhibit 4.

6.      The Labor Contract requires Defendant to submit monthly contributions to the Pension Fund on behalf of all employees in the bargaining unit, and sets forth the rate of

192272-1                                    2

contribution and the method for calculating the total amount of contributions due the Pension Fund. Exhibit 4, Article XXI. Contributions must be made for each hour for which employees receive pay at the contribution rate specified in the agreements. Failure to make the required contributions, or to submit either incorrect or late remittance reports and contributions, results in a delinquency to the Pension Fund. Under the terms of the Labor Contract, the employer also agrees to be bound by the Trust Agreement and the International Painters and Allied Trades Industry Pension Plan ("Plan") and by all amendments thereto and actions taken by the trustees of the Pension Fund. Exhibit 4, Article XXI, Section 2.

7.    My review of the records reveals that Defendant owes contributions in at least the amount of $5,946.00 plus attorney's fees and costs. This amount includes unpaid contributions for the period September 2006 through May 2007, as evidence by the recently performed audit and reports submitted by Defendants.

8.    Defendant owes interest through March 15, 2008 in the amount of $438.41 on the unpaid pension contributions set forth in ¶ 7. The interest has been calculated in accordance with the fluctuating IRS interest rate, as provided at section 10 of the Plan.

9.    Section 10 of the Plan parallels the ERISA statute, 29 U.S.C. § 1132(g)(2), and requires the assessment of liquidated damages against Defendant in an amount equal to the greater of the following: the amount of interest owed on the delinquent principal, or twenty percent (20%) of the delinquent principal. The total interest owed through March 15, 2008 is $438.41. Twenty percent (20%) of Defendant's unpaid contributions is $1,189.20. Since the interest amount ($438.41) is less than twenty percent (20%) of the unpaid contributions ($1,189.20), Defendant owes $1,189.20 in liquidated damages.

192272-1                                    3

10.    The Labor Agreement provides the Fund with the right to perform an audit of the records and documents of a contributing employer for the purpose of verifying contributions and deductions due and owing to the Fund(s) and to determine liabilities for contributions due and owing to the Fund(s). Exhibit 4, Article XXI, Section 1(A). The Pension Fund routinely audits employers to ensure all required contributions are being paid. It also audits employers in connection with delinquency collection lawsuits. An audit is the most accurate tool employed by the Pension Fund to ensure an employer's compliance with its statutory obligations. In performing these audits, the auditor reviews the payroll records of each employee who performs work of the type covered by the collective bargaining agreement. These records will include time cards, payroll ledgers, payroll summaries, time slips, or such other payroll records as the employer maintains which will indicate the number of hours that each individual employee worked and was paid for each week. The information gathered from these records is then compared to the wage information found on the employer's federal, state and municipal tax returns and on the W-2 statements provided to the employees. The auditor also reviews disbursement ledgers and check registers to identify potential wage payments to employees not made through the payroll system. Job/project contracts are reviewed to determine whether the work performed is within the scope of the collective bargaining agreement. After compiling the information gathered from the above records, a schedule of the contributions that should have been paid according to the contract is prepared. This schedule, which is broken down by month, is then compared to the actual contributions which the employer did submit to the Pension Fund, with any differences noted. Once completed, an audit report is forwarded to the employer for its review and payment.

192272-1                                    4

11.    Despite a continuing contractual obligation to do so, Defendant has repeatedly failed to submit timely remittance reports and pension contributions. The Pension Fund and its Trustees are required to pay benefits to all properly eligible employees of contributing employers. Employees of contributing employers continue to accrue pension credits, based on the hours of their employment, regardless of whether their employers make pension contributions on their behalf for these hours, as contractually required. The Pension Fund's obligation to recognize pension credits and to pay pensions to vested employees is absolute and continues even if the employers fail to pay their required pension contributions. Employer contributions and the earnings the Pension Fund receives by investing these contributions comprise the assets from which the Pension Fund pays retirement benefits to participants and their dependents and beneficiaries. When employers, like Defendant, fail to pay their contributions or do not pay them timely, the Pension Fund is deprived of the investment income they otherwise could have earned. In addition, the Pension Fund also must engage in time-consuming and costly efforts to collect the unpaid contributions. These efforts include letters and phone calls to the employer, investigating other sources for collection and attempting to calculate delinquency amounts and benefit eligibility through other sources (e.g. paystubs), if available. Further, the Pension Fund has to process benefit eligibility and benefit claims manually so that participants (and their dependents) employed by the delinquent employer are not deprived of retirement benefits. The actual losses and added costs (in terms of dollar amount, capital and manpower) incurred by the Pension Fund in connection with an employer contribution delinquency are not capable of precise determination, but they are substantial. Defendant's refusal to contribute as it is bound means irreparable harm and injury to the Pension Fund – an

obligation to make benefit payments to employees without necessary contributions from Defendant to cover those benefits. Therefore, Defendant should be required to submit timely current contributions and remittance reports in the future.

12.    I have executed this Declaration in support of Plaintiff's Motion for Default Judgment against Defendant and request that this Court consider the same as proof in support of the allegations contained in the Plaintiff's Complaint and other facts stated in this Declaration.

Pursuant to 28 U.S.C. § 1746, I declare under Penalty of perjury that the foregoing is true and correct.

Executed on: ___3/11/08___

_____
THOMAS C. MONTEMORE

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| INTERNATIONAL PAINTERS AND ALLIED TRADES INDUSTRY PENSION FUND<br>1750 New York Avenue, N.W.<br>Washington, DC 20006-5387 <br><br>                Plaintiff,<br>   v.<br><br>DEWAYNE CUSTOM PAINTING, INC.<br>a/k/a Custom Painting<br><br>   and<br><br>DEWAYNE BRAITHWAITE, individually and<br>d/b/a Dewayne Custom Painting, Inc.<br>a/k/a Custom Painting<br><br>                Defendants. | )<br>)<br>)<br>)<br>)<br>) CIVIL ACTION NO. 1:07-cv-01906 (JR)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DECLARATION OF JENNIFER L. HOPE

JENNIFER L. HOPE states:

1.  I am an associate with the law firm of Jennings Sigmond, P.C. with responsibility for the above-captioned case. I submit this declaration to support an award of attorney fees to Plaintiff.

<u>Case Fees</u>

2.  Attached as Exhibit 3 to Plaintiff's Motion for Entry of Judgment by Default is a list showing all work performed by the office of Jennings Sigmond, P.C. and related costs in connection with in this action through March 7, 2008. The listing was prepared from contemporaneous attorney time and expenses records and bills, the originals of which are maintained in the regular business records of Jennings Sigmond. Each piece of work is separately coded and the work performed is described. The fees relevant to this case are $2,882.00 and expenses are $621.13 for a total of $3,503.13.

191755-1



3.  The identity of those performing services related to this matter and normal hourly rates are as follows.

| INITIALS | NAME | TITLE | HOURLY RATE |
|----------|------|-------|-------------|
| KGC | Kent G. Cprek | Partner | $220.00 |
| SMC | Shanna M. Cramer | Associate | $220.00 |
| JLH | Jennifer L. Hope | Associate | $220.00 |

4.  Plaintiffs only seek judgment for fees in the bills, which reflect a special fee schedule with the International Painters and Allied Trades Industry Pension Fund for a uniform $220.00 per hour rate for all lawyers and $70.00 per hour for paralegals and clerks.

Attorney Background and Experience

5.  Kent Cprek.  Kent Cprek is a shareholder in Jennings Sigmond, P.C. and a co-leader in its ERISA Practice and have practiced law for 28 years. He was admitted to the State Bar of Michigan in November 1978, the bar of the Supreme Court of Pennsylvania in May 1984 and the District of Columbia Bar in 2002. He began practice with the firm of Marston, Sachs, Nunn, Kates, Kadushin and O'Hare, P.C., Detroit, Michigan, 48226, in the representation of plan participants, multiemployer funds and labor unions from 1978 to 1981.  From 1981 to 1984, he was employed by the Pension Benefit Guaranty Corporation as an attorney with responsibility for advice and litigation concerning termination of pension plans. He joined Sagot, Jennings & Sigmond, a predecessor to Jennings Sigmond, P.C. in 1984.  He has a J.D. cum laude from the University of Michigan Law School and a Master of Laws in Taxation from the Georgetown University Law Center. He is admitted to practice before the Supreme Court of the United States, the United States Courts of Appeals for the District of Columbia Circuit, Third Circuit, Fourth Circuit, Fifth Circuit and Sixth Circuit and the United States District Courts for the District of

Columbia, Eastern and Middle Districts of Pennsylvania and the Eastern and Western Districts of Michigan.

Since 1981, his work has been concentrated in the representation of employee benefit plans. His litigation experience includes representation of multiemployer plans and participants for more than twenty years, with trials of a number of actions and arbitrations and significant appellate work involving all aspects of withdrawal liability and pension law. A sample of his litigation experience is available in 53 published cases that be obtained through a Westlaw search for "AT (Cprek)" in the FPENS-CS library.

He has taught on the subject of Collections and Bankruptcy work for employee benefit plans for the International Foundation of Employee Benefit Plans.

Cprek, "Bankruptcy Basics," Attorney Pre-Conference Sessions, Annual Educational Conference, International Foundation of Employee Benefit Plans (1998)

Cprek, "Bankruptcy Basics," Attorney Sessions, Trustee and Benefit Professionals Institute, International Foundation of Employee Benefit Plans (1991)

Cprek, "Bankruptcy Collections by Employee Benefit Plans," Collection Procedures Institute, International Foundation of Employee Benefit Plans (1990)

Cprek, "Collecting from the Bankrupt Employer," Collections Procedures Institute, International Foundation of Employee Benefit Plans (April 1986)

Cprek, "Duties of Trustees in the Collection Process: The Law Today," reprinted in Employee Benefits Annual 1986: Proceedings of the Annual Employee Benefits Conference, p. 16 (IFEBP 1987).

Panelist, Seminar on Multiemployer Pension Plan Amendments Act, Pennsylvania Bar Institute (Fall 1987)

His later work has focused on benefit plan mergers and a continuing treatise on termination of single-employer pension plans. Cprek, "Single Employer Pension Plan Terminations," Schneider & Freedman (Eds.), ERISA: A Comprehensive Guide, (2d Ed. Aspen 2003).

6.    <u>Shanna M. Cramer</u>. Shanna M. Cramer, an associate in the firm, has actively practiced law for six (6) years. She graduated in 1997 from Rutgers University, with honors, with a Bachelors Degree in History, Political Science and Spanish. She received her law degree in 2001 from Rutgers Law School. Ms. Cramer graduated in 2004 from Beasley School of Law-Temple University, with an LL.M in Taxation. Ms. Cramer has been admitted to the Bars of Pennsylvania and New Jersey, and has been admitted to practice before the United States District Court for the Eastern District of Pennsylvania.

7.    <u>Jennifer L. Hope</u>. Jennifer L. Hope is an associate in the firm. She graduated in 1999 from Rutgers University and received her law degree in 2007 from City University of New York School of Law. She served as a staff editor of the New York City Law Review. Her article, co-authored with CUNY School of Law professor and arbitrator Merrick Rossein, "How Far to Cast the Net: Disclosure and Disqualification Standards for Neutral Arbitrators," was published in the Winter 2007 volume of the St. John's Law Review. During law school, Ms. Hope served as a judicial intern for the honorable Ronald L. Ellis of the Southern District of New York. Ms. Hope has been admitted to practice before the United States District Courts for the Eastern District of Pennsylvania and the District of New Jersey.

<u>Legal Market Benchmark</u>

8.    The time and fees charged in this case are reasonable based on prevailing market rates for similar services by lawyers of reasonably comparable skill, experience and reputation in both the Philadelphia and District of Columbia markets.

9.    My opinion that the time and fees are reasonable is based on a number of factors, including the following.

        a.   We serve as counsel or co-counsel to over 20 multiemployer employee benefit

funds groups. The firm currently has 16 lawyers, with a dedicated benefits department of seven (8) lawyers. The work is specialized and our competition often is large corporate firms with both employee benefits and federal litigation experience. In my experience, our fees are normally substantially lower than the charges of larger firms.

  b.  The flat rate in this case is consistent with market rates in published surveys by Altman Weil, a leading law firm consultant. Specifically, Altman Weil found a median hourly rate in 2005 of $195 for associates in the Middle Atlantic region and a range up to $273 per hour at the 90th percentile. See Associate Hourly Billing Rates (March 10, 2006), reprinted from http://www.altmanweil.com/PracticeSpecialtiesRates/ and attached hereto as Exhibit 5. The median rate for partners (shareholders) in employee benefits litigation was $305 per hour, *id.*, Practice Specialties and Hourly Rates (October 1, 2005). A $220 per hour rate in 2008 is only a 12% increase over the 2005 median for associates and 19% below the range for associates in the 90th percentile.

  c.  The fees are also consistent with market ranges in a 2004 Ohio bar association survey, downloads.ohiobar.org/conventions/convention2005/session508%20Economics%20of%20Law.pdf, attached as Exhibit 6, especially pages 26 and exhibit 27, especially after giving weight to increases from 2004 to 2006 (roughly 5% per year on average in the Ohio survey) and regional differences reflected in Altman Weil data, showing an 8.33% higher rate in median associates' rates in the Middle Atlantic region ($195) over the East North Central region covering Ohio ($180)). The Ohio survey showed median hourly associate rates in the comparable downtown Cleveland, Cincinnati and Columbus areas of $200 - $235 per hour, ranging up to $ $334 - $359 at the 90[th] percentile. It also shows that a $70 per hour paralegal rate

is less than the median rate for 5 years experience in Ohio, without adjustment for regional differences. Accordingly, Plaintiff's attorneys rates are reasonable.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Date: __March 18, 2008__                     /s/ Jennifer L. Hope_____
                                             JENNIFER L. HOPE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| INTERNATIONAL PAINTERS AND ALLIED TRADES INDUSTRY PENSION FUND 1750 New York Avenue, N.W. Washington, DC 20006-5387 | ) ) ) ) |
| Plaintiff, | ) ) CIVIL ACTION NO. 1:07-cv-01906 (JR) |
| v. | ) ) |
| DEWAYNE CUSTOM PAINTING, INC. a/k/a Custom Painting | ) ) ) |
| and | ) ) |
| DEWAYNE BRAITHWAITE, individually and d/b/a Dewayne Custom Painting, Inc. a/k/a Custom Painting | ) ) ) ) |
| Defendants. | ) ) |

**JENNINGS SIGMOND ATTORNEYS' FEES**

| | |
|---|---|
| Kent G. Cprek, Esquire | KGC |
| Shanna M. Cramer, Esquire | SMC |
| Jennifer L. Hope, Esquire | JLH |

| <u>Date</u> | <u>Attorney</u> | <u>Task</u> | <u>Time</u> |
|---|---|---|---|
| 10/15/07 | SMC | Review of Documents Open file Conference with Attorney J. Hope | 0.60 |
| 1/15/07 | JLH | Preparation of Complaint | 1.50 |
| 10/16/07 | SMC | Review and Revision of Complaint | 0.40 |
| 10/17/07 | SMC | Review and Revision of Complaint | 0.20 |
| 10/17/07 | JLH | Review and Revision of Complaint | 0.50 |

191755-1



| | | | |
|---|---|---|---|
| 10/18/07 | JLH | Review and Revision of Complaint | 0.30 |
| 10/19/07 | JLH | Preparation of Correspondence to T.Montemore And P. Gilbert | 0.10 |
| 10/19/07 | KGC | Review of Complaint | 0.30 |
| 10/24/07 | JLH | Preparation of Correspondence to P.Gilbert and T. Montemore | 0.10 |
| 11/12/07 | JLH | Preparation of Request to Entry of Default Phone Conference with Legal Errands | 0.40 |
| 11/15/07 | JLH | Review of Docket | 0.10 |
| 12/04/07 | JLH | Preparation of Correspondence to T.Montemore and P.Gilbert | 0.10 |
| 12/13/07 | JLH | Review Docket | 0.10 |
| 12/17/07 | JLH | Review Docket; Memo to File | 0.10 |
| 12/26/07 | JLH | Review Docket; Preparation of Correspondence to P.Gilbert | 1.10 |
| 1/02/08 | JLH | Preparation of Correspondence to P.Gilbert re: delinquencies; Review of Correspondence from P.Gilbert re: same | 0.20 |
| 1/07/08 | JLH | Review of Correspondence from Legal Errands re: Service | 0.10 |
| 1/09/08 | JLH | Phone Conference with Legal Errands; Preparation of Correspondence to T.Montemore | 0.20 |
| 1/10/08 | JLH | Review of Correspondence from T.Montemore re: Service; Preparation of Correspondence to T. Montemore re: same | 0.10 |
| 1/24/08 | JLH | Preparation of Correspondence to Legal Errands | 0.10 |
| 1/29/08 | JLH | Review of Correspondence to Legal Errands re: service; Preparation of Correspondence to T.Montemore re: same | 0.10 |
| 2/11/08 | JLH | Review Return of Service Review Docket | 0.10 |
| 2/14/08 | JLH | Review Docket Preparation of Correspondence to P.James | 0.20 |
| 2/18/08 | JLH | Review of Correspondence from P. James regarding Filing Memo to File | 0.10 |

191755-1

| 2/19/08 | Review of Court Notice | 0.10 |
|---------|------------------------|------|
| 2/25/08 | Review Docket, Entry of Default | 0.10 |

| 3/06/08 | Preparation of Motion for Default Judgment<br>Preparation of Proposed Order for Default Judgment<br>Preparation of Correspondence to P.Gilbert re: updated<br>Delinquencies | 1.8 |
|---------|------------------------|------|

| 3/07/08 | Review Correspondence from P.Gilbert<br>Review Correspondence from T.Montemore<br>Review Correspondence from V.Ledgerwood<br>Preparation of Correspondence to P.Gilbert<br>Preparation of Memorandum of Law in Support of<br>Motion for Default Judgment<br>Preparation of T.Montemore Declaration<br>Preparation of J.Hope Declaration<br>Preparation of Attorney's Fees<br>Review and Revision of all Default Judgment documents | 4.0 |
|---------|------------------------|------|

**TOTAL:**          **13.1**

**December 2007 Summary**

| Attorney's Fees | 13.1 Hrs x $220.00 | = | $2,882.00 |
|-----------------|--------------------|---|-----------|
| Costs | | = | $621.13 |

**Grand Total:**          **$3,503.13**

191755-1

# Agreement

Between

## PAINTERS AND ALLIED TRADES DISTRICT COUNCIL NO. 51

of the

## INTERNATIONAL UNION OF PAINTERS AND ALLIED TRADES, AFL-CIO, CLC

and the

## PAINTING, DECORATING, & DRYWALL FINISHING, CONTRACTORS

of Washington, D.C., Maryland, Virginia, and Vicinities
2006-2010



PLAINTIFF'S
EXHIBIT
4

# TABLE OF CONTENTS

|  |  |  | page |
| --- | --- | --- | --- |
|  | AGREEMENT | ................................................................ | 3 |
| ARTICLE I | RECOGNITION | ......................................................... | 3 |
| ARTICLE II | JURISDICTION | ......................................................... | 4 |
| ARTICLE III | CLASSIFICATIONS & DEFINITIONS | ............................... | 8 |
| ARTICLE IV | UNION SECURITY | .................................................... | 10 |
| ARTICLE V | FUNCTIONS OF MANAGEMENT | ................................... | 10 |
| ARTICLE VI | OUT OF GEOGRAPHIC JURISDICTION WORK | ............... | 11 |
| ARTICLE VII | COMPLIANCE WITH LAWS AND REGULATIONS | ............. | 12 |
| ARTICLE VIII | PAST PRACTICE CLAUSE | ......................................... | 12 |
| ARTICLE IX | NON-DISCRIMINATION CLAUSE | ................................. | 13 |
| ARTICLE X | SUPREMACY CLAUSE | .............................................. | 13 |
| ARTICLE XI | SUBCONTRACTING CLAUSE | ..................................... | 13 |
| ARTICLE XII | PRESERVATION OF WORK | ...................................... | 14 |
| ARTICLE XIII | SUCCESSOR CLAUSE | .............................................. | 15 |
| ARTICLE XIV | GENERAL SAVINGS CLAUSE | .................................... | 15 |
| ARTICLE XV | GENERAL CLAUSES | ............................................... | 16 |
| ARTICLE XVI | HIRING PROCEDURE | .............................................. | 17 |
| ARTICLE XVII | SAFETY AND CODE COMPLIANCE | ............................. | 19 |
| ARTICLE XVIII | HEALTH & SAFETY AND SKILL ENHANCEMENT TRAINING | ............ | 20 |
| ARTICLE XIX | ORGANIZING OBLIGATION | ....................................... | 20 |
| ARTICLE XX | STEWARDS | .......................................................... | 21 |
| ARTICLE XXI | TRUST FUNDS, CONTRIBUTIONS, COLLECTIONS AND SECURITIES | ... | 22 |
| ARTICLE XXII | JOINT TRADE BOARD | ............................................. | 32 |
| ARTICLE XXIII | GREIVANCES AND ARBITRATION | ............................... | 33 |
| ARTICLE XXIV | MARKET RECOVERY, ORGANIZING AND MAINTENANCE OF WORK | . | 35 |
| ARTICLE XXV | CHECK OFF OF ADMINISTRATIVE DUES | ...................... | 37 |
| ARTICLE XXVI | DURATION CLAUSE | ............................................... | 38 |

## PAINTERS & DRYWALL FINISHERS TRADE SPECIFICS
## AND WORKING CONDITIONS

| ARTICLE XXVII | GEOGRAPHIC JURISDICTION | ................................... | 40 |
| --- | --- | --- | --- |
| ARTICLE XXVIII | HOURS OF WORK, HOLIDAYS AND OVERTIME | ............... | 41 |
| ARTICLE XXIX | WAGES AND FRINGE BENEFIT CONTRIBUTIONS | ............ | 42 |
| ARTICLE XXX | WORKING CONDITIONS | .......................................... | 50 |

# AGREEMENT

This Agreement made and entered into this 1st day of June, 2006, by and between the undersigned painting, decorating, wallcovering, and drywall finishing contractors, hereinafter referred to as Contractor or Employer, and Painters and Allied Trades District Council No. 51, hereinafter referred to as the Union.

**WHEREAS**, the purposes of this Agreement are to establish harmonious relations and uniform conditions of employment between the parties hereto, to promote the settlement of any labor disagreements by conference and arbitration, to prevent strikes and lockouts, to utilize more fully the facilities of the Apprenticeship Training and Journeyman Education Program, to promote efficiency and economy in the performance of Painting, Decorating, Wallcovering, Drywall Finishing, and generally to create and maintain an atmosphere of Labor/Management cooperation for the parties hereto, for their mutual advantage and for the protection of the investing public; and ensure fair and equal employment opportunities regardless of race, creed, age, sex, or national origin.

## WITNESSETH:
## ARTICLE I
### RECOGNITION

**SECTION 1.**

The Employer hereby recognizes Painters and Allied Trades District Council 51 as the sole and exclusive bargaining agent, within the meaning of Section 9(a) of the National Labor Relations Act ("the Act"), of all employees of the Employer covered by this collective bargaining agreement, in all classifications of work described by the International Union of Painters and Allied Trades International Constitution Section 6. Such recognition is predicated on the Union's demand for such recognition pursuant to Section 9(a) of the Act, and on the Union's presentation of a clear showing that the majority of employees in the bargaining unit are members of the Union and desire the Union to act as their exclusive representative within the meaning of Section 9(a) of the Act. The Employer acknowledges that it has reviewed the Union's showing and agrees that it reflects the employees' desire to be represented by the Union under Section 9(a) of the Act.

# ARTICLE II
## JURISDICTION

**SECTION 1.**

This International Union shall have jurisdiction over all workers engaged in: all painting, decorating and coatings applications and wall covering; all levels of drywall and wall finishing; any and all labor, material, tools or equipment for preparatory work or surface treatment work in relation to painting, decorating and coating applications, wall covering, drywall and wall finishing; glazing; architectural metal and glass work; flooring and decorative floor covering work; paint and coatings manufacturing; sign, convention and display work; show decorators; scenic artists and designers; metal polishers; civil service, public and professional employees; book-binding; maintenance work; chemical, clerical and warehouse workers; any and all units, as well as all apprentice able crafts, that have historically been part of this International Union; and any and all work as may be obtained and maintained through organizing and collective bargaining. Such work shall include, but is not limited to:

**SECTION 2-PAINTERS**

Work will include, but not limited to: (1) preparation, application and removal of all types of coatings and coating systems in relation to all painting, decorating, protective coatings, coating and staining of concrete floors and toppings, waterproofing, masonry restoration, fireproofing, fire retarding, metal polishing, refinishing, sealing, lining, fiber glassing, E-Glass fiberglass, carbon fiber, encapsulating, insulating, metalizing, thermal and flame spray, the application of Exterior Insulating Finishing Systems; (2) each and all such applications, and similar or substitute applications, on all surfaces, interior and exterior, to include, but not to be limited to: residences; buildings; structures; industrial, power, chemical and manufacturing plants; bridges; tanks; vats; pipes; stacks; light and high tension poles; parking, traffic and air strip lines; trucks; automobile and railroad cars; ships; aircraft; and all machinery and equipment; (3) any and all material used in preparation, application or removal of any paint, coatings or applications, including, but not limited to: the handling and use of thinners, dryers, sealers, binders, pigments, primers, extenders, air and vapor barriers, emulsions, waxes, stains, mastics, plastics, enamels, acrylics, epoxies, epoxy injection and T-Lock welding, alcalyeds, sheet rubber, foams, seamless and tile-like coatings, etc.; (4) all preparation for and removal of any and all materials for finishes, such as deep cleaning, patching, all levels of finishing, taping/finishing skim coating,

pointing, caulking, high pressure water, chemical and abrasive blasting, environmental blasting, wet/dry vacuum work, chemical stripping, scraping, air tooling, bleaching, steam cleaning, asbestos and lead abatement/removal, and mold remediation; (5) the inspection of all coatings and/or coating systems during their applications will be performed by members of this International Union.

## SECTION 3-WALL COVERING

Work will include, but not limited to: (1) all material applied to walls or ceilings with adhesive, staples, tacks, by stretching or adhered by any other method, including all papers, vinyls, flexible woods, fabrics, borders, metals, upholstered wall systems, the fabric covered panels made of plastic/wood or prefinished products of micro fiberglass, etc., acrovin and various plastic wall coverings such as wainscoat, caps, corner moldings and accessories; (2) any and all preparation of walls and ceilings such as scraping or any methodology for removal of existing materials, including patching, leveling, skim coating and priming.

## SECTION 4-DRYWALL FINISHING

Work will include, but not be limited to: (1) the preparation or leveling of any surface or substrate which is to receive a coating, finish and/or wall covering; this will include, but not limited to, all levels of finishing and/or spackling of all surfaces, including gypsum wallboard taping and finishing, fire taping and all fire stopping systems, glaze coatings, skim coating or any other finishing system, spotting of nails, finishing of corner beads/flex beads. Patching and sanding is within the system of preparing surfaces for finishes. (2) all stucco and dryvit systems will be performed by members of this International Union.

## SECTION 5-GLAZIERS, ARCHITECTURAL METAL AND GLASS WORKERS

General Glazing will include, but not to be limited to: (1) the installation, setting, cutting, preparing, fabricating, distributing, handling or removal of the following: art glass, prism glass, beveled glass, leaded glass, automotive glass, protection glass, plate glass, window glass, pre-glazed windows, mirrors of all types, wire glass, ribbed glass, ground glass, colored glass, figured glass, vitrolite glass, carrara glass, all types of opaque glass, glass chalk boards, structural glass, curtainwall systems, louvers, tempered and laminated glass, thiokol, neoprene, all types of insulating glass units, all plastics or other similar materials when used in place of glass to be set or glazed in its final resting place with or without putty, vinyl, molding, rubber,

lead, sealants, silicone and all types of mastics in wood, iron, aluminum, sheet metal or vinyl sash, skylights, doors, frames, stone wall cases, show cases, book cases, sideboards, partitions and fixtures; (2) the installation of the above materials when in the shop or on the job site, either temporary or permanent, on or for any building in the course of repair, remodel, alteration, retrofit or construction; (3) the installation and welding of all extruded, rolled or fabricated materials including, but not limited to, all metals, plastics and vinyls, or any materials that replace same, metal and vinyl tubes, mullions, metal facing materials, corrugated flat metals, aluminum panels, muntins, facia, trim moldings, porcelain panels, architectural porcelain, plastic panels, unitized panels, skylights, showcase doors, all handrails and relative materials, including those in any or all types of building related to store front, door/window construction and curtain wall systems; (4) the installation of automatic door entrances, door(s) and window(s) frame assemblies such as patio sliding or fixed doors, vented or fixed windows, shower doors, bathtub enclosures, storm sash where glass becomes an integral part of the finished product, including the maintenance of all the above; (5) bevellers, silverers, scratch polishers, abrasive blasters, flat glass wheel cutting, miter cutters, engravers, hole drilling, machine operations, belt machines and all machines used in the processing of glass, automatic beveling, silvering, grinding, polishing, unpacking and racking of glass, packing glass, glass cleaners in shops, mirror cleaning, assembling, framing and fabrication and assembling of all insulated and non-insulated units, fabrication and mounting of mirrors and the operations of all machines and equipment for these operations; (6) the selecting, cutting, preparing, designing, art painting, and installing of fused glass, thick facet glass in concrete and cementing of art glass, and the assembly and installing or removal of all art glass, engraving, drafting, etching, embossing, designing, abrasive blasting, chipping, glass bending, glass mosaic workers, cutters of all flat and bent glass; glass shade workers, and glaziers in lead or other glass metals; the fabrication and distribution of all glass and glass-related products; (7) any and all transportation, handling, unloading and loading of tools, equipment and materials will be performed by members of this International Union.

## SECTION 6-SIGN AND DISPLAY

Sign and Display Painters work shall include, but not be limited to: (1) the making and installation of all signs and servicing of same, designing, lettering and pictorial work of any kind, including vinyl signs and vinyl substrates and the preparing for the finishing of same, be it by hand brush, roller, spray, mechanical or computer-aided and by any other method or process

pertaining to same; (2) they shall have control of all branches, methods and processes of screen process work; tube bending and display work such as creating, designing, building and furnishing of all display matter and its related operations used for advertising purposes, including all art work and lettering whether it is done by hand, mechanical or computer aided or by any other method or process pertaining to same; (3) the construction, erection, and maintenance of all billboards and all communication advertising will be done by members of this International Union.

## SECTION 7- METAL POLISHERS

Metal Polishers' work will include, but not be limited to: new construction and existing sites consisting of metal polishing, both the initial and continuing maintenance which shall include, but not be limited to, coloring, lacquering, spraying, application of vinyl coatings, cleaning, polishing and finishing of ornamental and architectural iron, bronze, brass, nickel, aluminum, stainless steel and all metal specialty work.

## SECTION 8-ALL TOOLS, EQUIPMENT AND MATERIAL

1) The handling, assembling, disassembling, operation, maintenance, storage and transporting of all tools, equipment and material used or that may be used by members of this International Union in performing their trade or work; (2) the loading and unloading of any and all materials, tools and equipment will be done by any members and units coming under the International Union's jurisdiction; (3) tools, material and equipment, as used herein, shall include, but not be limited to, brushes, rollers, spray painting equipment, coating applicators, all miscellaneous hand and power driven tools, all robotic, computerized mechanical and manually operated abrasive, shot, bead, water and related blasting equipment, containment systems, ventilation /dehumidification systems, vacuum recovery units, wet and dry vacuum systems and any and all related safety equipment, ladders, scaffolding, lifts and all other dedicated rigging, including the handling, erection and dismantling of same, the operation and maintenance of all types of compressors.

## SECTION 9-RELATED WORK

Members of this International Union shall also have jurisdiction of: (1) all processes and procedures for decontamination of all contaminated areas; (2) all clean-up of any type debris caused by or during the preparation and/or application of any work described in this Section.

# SECTION 10-TECHNOLOGICAL IMPROVEMENTS, ADVANCEMENTS, NEW OR SUBSTITUTE SYSTEMS OR PROCESSES AND/OR NEW OR SUBSTITUTE MATERIALS:

The jurisdiction of this International Union shall include and extend to any and all new or substitute systems or processes, new or substitute materials and technological improvements or advancements in any existing or new system, process or material that is referred to or incorporated in any of the provisions in the General Constitution or any collective bargaining agreement to which the International or any of its subordinate bodies is a party.

## ARTICLE III
## CLASSIFICATIONS & DEFINITIONS

### SECTION 1-EMPLOYER/CONTRACTOR

An **EMPLOYER/CONTRACTOR** is defined to be an individual, firm, partnership, or corporation, its heirs or their assigns or purchaser, whose business is in the painting, drywall finishing, wall covering, sign painting, glass and glazing or any other work classification covered under the scope of this Agreement.

### SECTION 2-UNION

The **UNION** is defined as The International Union of Painters and Allied Trades District Council 51.

### SECTION 3- WORKER CLASSIFICATIONS

#### A. JOURNEYPERSON

A **JOURNEYPERSON** is defined as an individual who has completed the requirements at the Entry Level Journeyperson or graduated from a registered Apprenticeship Program in order to advance to Journeyperson status and demonstrates their proficiency as a mechanic to perform duties pertaining to the painting, decorating, wall covering, drywall finishing, sign painting, glass and glazing industry(s).

#### B. APPRENTICE

An **APPRENTICE** is defined as one who is learning the painting, decorating and/or glass and glazing and/ or wall covering and/or drywall finishing trade(s) and who has registered with the Joint Apprenticeship Training and Journeyman Education Fund of

District Council 51 and has been accepted by that Committee, and who is working in the trade and has not graduated from apprenticeship school. Ratio: 3 Journeypersons to 1 Apprentice

## C. ENTRY LEVEL JOURNEYPERSON

**(To be utilized on painting, drywall finishing and wallcovering only)**

An **ENTRY LEVEL JOURNEYPERSON** is defined as an individual who has passed the required proficiency evaluation. This individual must complete four thousand (4,000) hours of employment as an Entry Level Journeyperson and complete all mandatory certified Health & Safety Training to be eligible for reevaluation as a Journeyperson.

A ratio of three (3) Journeypersons to one (1) Apprentice must be met before Entry Level Journeypersons can be utilized. Once appropriate ratios are met Entry Level Journeypersons may be utilized at a ratio of one (1) Entry Level Journeyperson for every four (4) employees.

## D. UTILITY WORKER

**(To be utilized on Industrial Work and the Market Recovery Package)**

A **UTILITY WORKER**, is an individual that has not passed the required proficiency evaluation, is not an apprentice, nor has graduated from a registered Apprenticeship Program; but does demonstrate an ability to perform different or various aspects of preparatory or cleaning work for the painting, decorating, wall covering, drywall finishing, glass and glazing industry(s). This individual must complete 2,000 hours of employment and complete the mandated Health & Safety Training to advance to the next level in either the Apprenticeship Program or be eligible for evaluation at the Entry Level Journeyperson level. No Fringe Benefits contributions will be due, all deductions will apply per the Collective Bargaining Agreement. A sliding scale $9.00 to $13.00 per hour is established and will be determined by the employer based on the workers proficiency. On the Market Recovery package the ratio shall be one (1) Utility Worker to three (3) Painters.

# ARTICLE IV
## UNION SECURITY

**SECTION 1.** All present employees who are members of the Union on the effective date of this Agreement or on the date of execution of this Agreement, whichever is the later, shall remain members of the Union in good standing as a condition of employment. All present employees who are not members of the Union and all employees who are hired hereafter shall become and remain members in good standing of the Union as a condition of employment on and after the eighth day following the beginning of their employment, or on and after the eighth day following the effective date of this Agreement or the date of execution of this Agreement, whichever is the later.

**SECTION 2.** No provision of this Article shall apply in any state to the extent that it may be prohibited by state law. If under applicable state law additional requirements must be met before any such provision may become effective, such additional requirements shall be first met.

**SECTION 3.** If any provision of this Article is invalid under the law of any state wherein this contract is executed, such provision shall be modified to comply with the requirements of state law or shall be renegotiated for the purpose of adequate replacement. If such negotiations shall not result in mutually satisfactory agreement, either party shall be permitted all legal or economic recourse.

**SECTION 4.** In those instances where this Article may not be validly applied, the Employer agrees to recommend to all employees that they become members of the Union and maintain such membership during the life of this Agreement, to refer new employees to the Union representative and to recommend to delinquent members that they pay their dues since they are receiving the benefits of this Agreement.

# ARTICLE V
## FUNCTIONS OF MANAGEMENT

In the exercise of its function of management, the Employer shall have the right to plan, direct and control operations of all its work, hire employees, direct the working forces in the field, assign employees to their jobs, discharge, suspend or discipline for proper cause (proper cause for discharge includes but is not necessarily limited to incompetence, insubordination, habitual tardiness or absenteeism) transfer, promote or demote employees, lay off employees because of

the lack of work, or for other legitimate reasons, require employees to observe the Employer's rules and regulations not inconsistent with this Agreement, institute a fair and consistently applied drug policy, regulate the amount of equipment used and the use of equipment and other property of the Employer, decide the number of employees needed; provided, however, that the Employer will not use its rights for the purpose of discrimination against any employee.

On work as defined under Article II, the Employer and the Union recognize the necessity of promoting efficiency and agree that no local rules, customs or practices shall be permitted that limit production or manpower required to do the work and that no limitations shall be placed on the amount of work which an employee is performing during the work day. No regulations of tools shall be interpreted or enforced in any way to prevent their use where required or necessary to perform an acceptable job in accordance with specifications of the appropriate agency and where all proper safety regulations are enforced.

## ARTICLE VI
### OUT OF GEOGRAPHIC JURISDICTION WORK

**SECTION 1.** The Contractor or the Employer party to this Agreement, when engaged in work outside the geographical jurisdiction of the Union party to this Agreement, shall employ not less than fifty percent (50%) of the workers employed on such work from among the residents of the area where the work is performed, or from among persons who are employed the greater percentage of their time in such area; any others shall be employed only from the Employer's home area.

**SECTION 2.** The Employer party hereto shall, when engaged in work outside the geographic jurisdiction of the Union party to this Agreement, comply with all of the lawful clauses of the Collective Bargaining Agreement in effect in said other geographic jurisdiction and executed by the Employers of this industry and the affiliated Local Unions in that jurisdiction, including, but not limited to, the wages, hours, working conditions, fringe benefits, and procedure for settlement of grievances set forth therein; provided, however, that as to employees employed by such Employer from within the geographic jurisdiction of the Union party to this Agreement and who are brought into an outside jurisdiction, such employees shall be entitled to receive the wages and conditions effective in either the home or outside jurisdiction, whichever are more

favorable to such employees, and fringe benefit contributions on behalf of such employees shall be made solely to their home funds in accordance with their governing documents. This provision is enforceable by the Local Union or District Council in whose jurisdiction the work is being performed, both through the procedure for settlement of grievances set forth in its applicable Collective Bargaining Agreement and through the courts, and is also enforceable by the Union party to this Agreement, both through the procedure for settlement of grievances set forth in this Agreement and through the courts.

## ARTICLE VII
### COMPLIANCE WITH LAWS AND REGULATIONS

**SECTION 1.** The Employer shall carry Workers' Compensation Insurance and such other insurance as may be required by the laws of the District of Columbia and the States within the geographical jurisdiction of District Council No. 51 and shall furnish proof thereof to the representatives of the above named District Council No. 51.

**SECTION 2.** The Employer agrees to furnish proof upon request to District Council No. 51 and its representatives that he is in compliance with all laws governing liability to his employees, Workers' Compensation, and any other laws now in effect or which may be enacted in the future for the benefit and protection of labor. The Contractor also agrees upon request to furnish proof to the District Council No. 51 as to his contributions to all Trust Funds referred to in this Agreement and to the Joint Trade Board, as required by this Agreement.

## ARTICLE VIII
### PAST PRACTICE CLAUSE

The Employer agrees that all conditions of employment in the Employer's operation relating to wages, hours or work, overtime differentials and general working conditions shall be maintained at no less than the highest standards in effect at the time of the signing of this Agreement, and the conditions of employment shall be improved wherever specific provisions for improvement are made elsewhere in this Agreement.

## ARTICLE IX
### NON DISCRIMINATION CLAUSE

The Employer and/or the Union shall not discriminate against any person because of union membership, or union activities, or on account of age, race, color, sex, national origin, ancestry, religion or sexual preference in the hire, discharge, transfer, layoff, discipline or in the assignment of jobs or with respect to any other terms and conditions of employment.

## ARTICLE X
### SUPREMACY CLAUSE

The Employer agrees not to enter into any agreement or contract with his or her employees, individually or collectively, which in any way conflicts with the terms and provisions of this Agreement. Any such agreement shall be null and void.

## ARTICLE XI
### SUBCONTRACTING CLAUSE

**SECTION 1.** The Employer shall not contract out or subcontract any work covered by this Agreement to any subcontractor or other person unless that subcontractor or other person is a party to a Collective Bargaining Agreement with a District Council or Local Union affiliated with the International Union of Painters and Allied Trades, AFL-CIO, CLC.

**SECTION 2.** In the event the Employer subcontracts any job site work covered by this Agreement, the Employer shall be a guarantor of performance by the subcontractor of all terms and conditions of said subcontractor's Agreement with the Union; or, in the absence of such an Agreement, of all terms and conditions of this Agreement. In the event, the Employer shall be liable to the Union for any act or omission of the subcontractor which in any way departs from or is inconsistent with the terms of said subcontractor's Agreement with the Union; or, in the absence of such Agreement, with the terms and conditions of this Agreement.

**SECTION 3.** The Employer may subcontract work to other parties in order to control its risk with warranties, and to address particular manufacturer's requirements, provided that before doing so the Employer demonstrates to the satisfaction of the Union that the subcontracting is essential for the foregoing purposes.

# ARTICLE XII
## PRESERVATION OF WORK

**SECTION 1.**  To protect and preserve, for the employees covered by this Agreement, all work they have performed and all work covered by this Agreement, and to prevent any device or subterfuge to avoid the protection and preservation of such work, it is agreed as follows: If the Employer performs on-site construction work of the type covered by this Agreement, under its own name or the name of another, as a corporation, company, partnership, or other business entity, including a joint venture, wherein the Employer, through its officers, directors, partners, owners, or stockholders, exercises directly or indirectly (through family members or otherwise), management, control, or majority ownership, the terms and conditions of this Agreement shall be applicable to all such work.

**SECTION 2.**  All charges of violations of Section 1 of this Article shall be considered as a dispute and shall be processed in accordance with the provisions of this Agreement on the handling of grievances and the final and binding resolution of disputes.  As a remedy for violations of this Article, the Joint Trade Board or Arbitrator shall be able, at the request of the Union, to require an Employer to pay:  1) to affected employees covered by this Agreement, including registered applicants for employment, the equivalent of wages those employees have lost because of the violations, and 2) into the affected Joint Trust Funds to which this Agreement requires contributions, any delinquent contributions that resulted from the violations.  The Joint Trade Board or Arbitrator shall be able also to provide any other appropriate remedies, whether provided by law or this Agreement.  The Union shall enforce a decision of the Joint Trade Board or Arbitrator under this Article only through arbitral, judicial, or governmental (for example, the National Labor Relations Board) channels.

**SECTION 3.**  If, after an Employer has violated this Article, the Union and/or the Trustees of one or more Joint Trust Funds to which this Agreement requires contributions institute legal action to enforce an award by an Arbitrator or the Joint Trade Board remedying such violation, or defend an action that seeks to vacate such award, the Employer shall pay any accountants' and/or attorneys' fees incurred by the Union and/or the Joint Trust Funds, plus costs of the litigation, that have resulted from such legal action.  This Section does not affect other remedies, whether provided by law or this Agreement that may be available to the Union and/or the Joint Trust Funds.

## ARTICLE XIII
### SUCCESSOR CLAUSE

This Agreement, and any supplements or amendments thereto, hereinafter referred to collectively as "Agreement," shall be binding upon the parties hereto, their successors, administrators, executors and assigns.

In the event the Employer's business is, in whole or in part, sold, leased, transferred, or taken over by sales, transfer, lease, assignment, receivership, or bankruptcy proceedings, such business and operation shall continue to be subject to the terms and conditions of this Agreement for the life thereof.

It is understood by this provision that the parties hereto shall not use any leasing or other transfer device to a third party to evade this Agreement. The Employer shall give notice of the existence of this Agreement and this provision to any purchaser, transferee, lessee, assignee, etc., of the business and operation covered by this Agreement or any part thereof. Such notice shall be in writing with a copy to the Union, at the time the seller, transferor, or lessor executes a contract or transaction as herein described. The Union shall also be advised of the exact nature of the transaction, not including financial details.

In the event the Employer fails to require the purchaser, transferee, or lessee to assume the obligations of this Agreement, the Employer (including partners thereof) shall be liable to the Union, and to the employees covered for all damages sustained as a result of such failure to require assumption of the terms of this Agreement, but shall not be liable after the purchaser, transferee, or lessee has agreed in writing to assume the obligations of this Agreement.

## ARTICLE XIV
### GENERAL SAVINGS CLAUSE

If any Article or Section of this Agreement should be held invalid by operation of law or by any tribunal of competent jurisdiction, or if compliance with or enforcement of any Article or Section should be restrained by such tribunal pending a final determination as to its validity, the remainder of this Agreement or the application of such Article or Section to persons or circumstances other than those as to which it has been held invalid or as to which compliance with or enforcement of has been restrained, shall not be affected thereby.

In the event that any Article or Section is held invalid or enforcement of or compliance with any Article or Section has been restrained, as above set forth, the affected parties shall meet at the request of the Union, for the purpose of arriving at a mutually satisfactory replacement for such Article or Section during the period of invalidity or restraint. If the parties do not agree on a mutually satisfactory replacement within sixty (60) days after beginning of the period of invalidity or restraint, either party shall be permitted all legal or economic recourse in support of its demands notwithstanding any provision in this Agreement to the contrary.

## ARTICLE XV
### GENERAL CLAUSES

**SECTION 1.** District Council No. 51 shall have full authority to modify the terms and/or conditions of this Agreement, to pinpoint, maintain and/or organize work opportunities covered under the scope of this Agreement for its duration.

**SECTION 2. ACCRETION CLAUSE**

This Agreement shall apply to all present and subsequently acquired operations of the Employer and to all accretions to the bargaining unit, including but not limited to newly established or acquired operations.

**SECTION 3. PICKET LINE CLAUSE**

It shall not be a violation of this Agreement, and it shall not be cause for discharge or disciplinary action, in the event an employee refuses to enter upon any property involved in a primary labor dispute, or refuses to go through or work behind any primary picket line, including the primary picket line of the Union party to this Agreement, and including primary picket lines at the Employer's own places of business or jobs.

**SECTION 4. STRUCK WORK CLAUSE**

It shall not be a violation of this Agreement, and it shall not be cause for discharge or disciplinary action, if any employee refuses to perform any service which his or her Employer undertakes to perform for an Employer or person whose employees are on strike, and which service, but for such strike, would be performed by the employees of the Employer or person on strike.

**SECTION 5. SUPPORT OF PRIMARY ACTIVITY**

Employees covered by this Agreement shall have the right to respect any legal primary picket line validly established by any bona fide labor organization, and the Union party to this Agreement has the right to withdraw employees covered by this Agreement whenever the Employer party to the Agreement is involved in a legitimate primary labor dispute with any bona fide labor organization

## ARTICLE XVI
### HIRING PROCEDURE

**SECTION 1**.  The Union will be the sole and exclusive source of referrals of applicants for employment with signatory employers for all worker classifications.

**SECTION 2**.  The Employer shall have the right to reject any applicant for employment.

**SECTION 3**.  The Union shall select and refer all qualified applicants for employment without discrimination against such applicants by reason of membership or non-membership in the Union and such selection and referral shall not be affected in any way by rules, regulations, bylaws, constitutional provisions, or any other aspect or obligation of the Union membership policies or requirements.   All such selection and referral shall be in accordance with the following procedure.

**SECTION 4**.  The Union shall maintain a register of applicants for employment.  Applicants shall be listed in chronological order of the dates they register.   If the registration list is exhausted, and the Union is unable to refer applicants for employment to the Employer within forty-eight (48) hours from the time of receiving the Employer's request, Saturdays, Sundays and holidays excepted, the Employer shall be free to secure applicants without using the referral procedure.  The Employer shall notify the Union promptly of the names, addresses and Social Security numbers of such directly-hired employees.

**SECTION 5**.  Employers shall advise the Union of the number of qualified applicants needed, the work to be performed, the work or project location, the starting time, the name of the person the applicant is to report to, the name of any individual that the Employer requests by name who was formerly employed by the Employer and any special skills or abilities involved.  The Union shall refer qualified applicants to the Employer by the order of their places on the register and provide the employer with a Referral Placement Form, via fax, e-mail, or some other form of

electronic communication, which shall contain the name, classification, wage rate, start date, starting time, the work or project location, and person the applicant is to report to, work to be performed and whether there are any special skills or certifications required, or whether the qualified applicant was requested by name because of being formerly employed by the employer. No member shall be allowed to by-pass the referral procedure.

**SECTION 6.** Any applicant who is rejected by the Employer shall be returned to his/her appropriate place on the register, and shall be referred to other employment in accordance with the position on the register.

**SECTION 7.** The only exceptions which shall be allowed in this order of referral are as follows: 1) When the Contractor states bona fide requirements for special skills and abilities in the request for applicants, the District Council shall refer the first qualified applicant on the register possessing such skills and abilities; 2) The Employer may request any member of the Union regardless of that member's position on the register, who was formerly employed by the Employer.

**SECTION 8.** When any member is laid off, voluntarily quits, is discharged or terminated for just cause the employer will furnish notification of such by submitting a Lay-Off -- Voluntarily Quit - Termination Form to the District Council, via fax, e-mail, or some other form of electronic communication, which shall contain the name of the company, the name and social security number of the member that is being laid off, or quit, or was terminated. The reason for the lay-off or termination, whether the member can be referred to the employer in the future or be placed on the do not send list, and any other information that will explain the employer's decision or actions.

**SECTION 9.** Should any member referred for employment be terminated for just cause, his or her referral privileges shall be suspended for two weeks. Should the same individual be terminated for cause a second time within a twenty-four (24) month period, his or her referral privileges shall be suspended for one (1) month. Should the same individual be terminated for cause a third time within a twenty-four (24) month period, his or her referral privileges shall be suspended indefinitely.

A termination shall not be considered as "for just cause" for purpose of this provision if the person referred for employment has filed a grievance challenging the propriety of his or her termination, unless and until the grievance is resolved in a manner that affirms the termination

for just cause. For purpose of this provision, a decision of the District Council Joint Trade Board and/or an arbitrator shall be final and binding.

The provisions in subsections (a) and (b) notwithstanding, a Termination Review Committee, composed of the members of the District Council Joint Trade Board may, upon written request of the member, vacate or reduce the period of suspension should the Committee determine, following inquiry or investigation, in its sole and complete discretion, that equity requires such action.

**SECTION 10.** Apprentices shall be hired and transferred in accordance with the apprenticeship provisions of the Agreement between the parties.

**SECTION 11.** A copy of the referral procedure set forth in this Agreement shall be posted on the bulletin board in the offices of the Local Unions and in the offices of the Employers who are parties to this Agreement.

# ARTICLE XVII
## SAFETY & CODE COMPLIANCE

**SECTION 1.**

The Employer must abide by all rules and regulations established by OSHA and all other applicable safety rules and regulations. No employee will be dismissed or otherwise disciplined for refusal to work under unsafe conditions and will suffer no lost work when other work is available with the employer.

**SECTION 2.**

Safety rules and regulations, including those, which may have been established by the Client and the Employer, shall be adhered to at all times as a condition of employment. Minimum standards provided by Federal, State and Local regulations shall be complied with. The Union recognizes that the responsibility for the establishment of safety rules and their enforcement rests with the Employer. The Union and the Employer agree that the enforcement of safety rules is to the mutual benefit of both and any questions concerning such rules will be appropriate subjects for discussions with the District Council and/or for processing under the Grievance Procedure of Article XXIII.

**SECTION 3.**

In accordance with the requirements of the Occupational Safety and Health Act of 1970, it shall be the exclusive responsibility of the Employer to ensure the safety of its employees and compliance by them with all safety rules contained herein or established by the Employer. Nothing in this Agreement will make the Union or District Council liable to any employees or to any other persons in the event that work related disease, sickness, death, injury or accident occurs. Questions arising under this Article will be appropriate subjects for discussion with the District Council and/or for processing under the Grievance Procedure of Article XXIII.

**SECTION 4.**

The Employer shall notify the Union sixty (60) days in advance of any changes in conditions of employment that may affect the health and safety of employees.

**SECTION 5.**

Except as clearly and specifically required by law or regulation, the Employer shall not require any employee to sign a form or statement dealing with health and safety, hazards in the workplace, or instruction and training relating to hazards in the workplace, unless that form or statement has been negotiated with and agreed upon by the Union.

**SECTION 6.**

The Employer may require employees to attend Journeyperson Upgrading and Health and Safety certification classes when offered by the Union.

## ARTICLE XVIII
### HEALTH & SAFETY AND SKILL ENHANCEMENT TRAINING

All active Journeypersons must complete one (1) health & safety or skill enhancement training class, annually, after work hours.

## ARTICLE XIX
### ORGANIZING OBLIGATION

When any member is notified to report for organizing activities by the District Council, the Employer agrees to accommodate any employee with the appropriate time off to fulfill their obligations under the mandatory organizing activities implemented by the District Council.

# ARTICLE XX
## STEWARDS

**SECTION 1.** Stewards shall be designated in all shops by the Union. The duties of the Stewards shall be as follows: 1) to see that the provisions of this Agreement are observed; 2) to receive and endeavor to adjust at the first step, all grievances which may be submitted to them. The Stewards shall be allowed sufficient and reasonable time during regular working hours to carry on any activities necessary to discharge their duties. They shall have authority to check the identification of individuals employed on the job or in the shop. The Employer shall not dismiss or otherwise discipline any Steward for properly performing his or her duties, nor shall the Employer dismiss or otherwise discipline any employee for making a complaint to the Steward or giving evidence with respect to an alleged violation of this Agreement. In the event that a particular job or project should be identified by the District Council to require a steward, the Steward shall have top seniority on the job to which he or she is assigned, as long as he or she remains in the position of Steward. Top seniority shall only apply with respect to lay-off and overtime. With the exception of the foreman or supervisory personnel placed in charge of a job, the steward shall be the last to be laid off. The Steward shall perform work in the same manner as any other employee and shall cooperate with the supervisor to expedite the progress of the work. Stewards may be relieved of their duties at any time at the discretion of the Union or when they do not possess the qualified skills to perform the work available.

**SECTION 2.** It shall also be the duty of the Steward to see that all employees have their working cards or permits.

**SECTION 3.** The Union reserves the right to withdraw employees covered by this Agreement from any job where the Stewards or Business Representatives or Business Manager/Secretary-Treasurer of the District Council are prohibited, either from entering upon the premises of the job to inspect and investigate working conditions, or from conducting an adequate inspection, investigation and report of such working conditions.

## ARTICLE XXI
## TRUST FUNDS, CONTRIBUTIONS, COLLECTIONS AND SECURITIES

**SECTION 1.**

### A. FRINGE BENEFIT CONTRIBUTIONS

No later than the twenty-fifth (25) day of each and every month the Employer shall mail to the Trustees of their designated depository, a check or checks being made payable as designated to cover payment for the previous month to the Health and Welfare Fund, Pension Fund, Apprenticeship and Training Fund, Political Action Fund, Administrative Dues Check-Off, Organizing Fund, and any other fund that is established within this Agreement. In addition, the Employer will properly complete and mail such forms and records as designated by the Trustees of said Fund. Each or any of the Funds referenced in this Agreement may engage a certified public accounting firm to periodically audit the books, payroll and wage records of any contributing Employer(s) for the purpose, of verifying contributions and deductions due and owing to the respective Fund(s) and/or liabilities for contributions due and owing to such Fund.

In the event such audit discloses for any period a deficiency in the payments reported and paid/not paid and the outstanding deficiency owed is greater than 10% of the amount originally reported for such period under this Agreement, the cost of the audit will be borne by the Employer.

In addition to all other remedies available to the parties and/or the various Fringe Benefit Funds with respect to "delinquent" Employers, the Union may treat any failure by an Employer to satisfy a delinquency as a breach of this Agreement. In such event, the Union may, in addition to any other remedy that may be available to it, and without being limited by any "no strike" obligation that may appear in this Agreement or be implicit in its terms, remove its members from any job(s) of such delinquent Employer. A removal of manpower by the Union, pursuant to this provision, shall not be construed as a "termination" of this Agreement with respect to any affected Employer.

### B. BONDS/SECURITY FOR FUND PAYMENTS

The sum of one thousand five hundred dollars ($1,500) or a surety bond may be required of not less than five thousand dollars ($5,000) and no more than fifty thousand dollars

($50,000), at the discretion of District Council 51, in guaranteeing payment of any wages, fringe benefits and deductions by any signatory Employer.

In lieu of a "bond", a "Letter of Credit" or "Certified Check" to be held in escrow (no interest to be paid) is acceptable. The amount of which may be adjusted for new Employers at the discretion of the District Council. The District Council and/or Trustee's may require accelerated payments if any Employer(s) payments are irregular.

## SECTION 2. INTERNATIONAL UNION OF PAINTERS AND ALLIED TRADES UNION AND INDUSTRY PENSION FUND AND INTERNATIONAL UNION OF PAINTERS AND ALLIED TRADES UNION AND INDUSTRY ANNUITY PLAN

The only agreement between the Employer(s) and the Union parties to this Agreement regarding pensions or retirement for employees covered by this Agreement is as follows:

1. a.   Commencing with the 1st day of June 2006, and for the duration of the Agreement, and any renewals or extension thereof, the Employer agrees to make payments to the International Union of Painters and Allied Trades Union and Industry Pension Fund for each employee covered by this Agreement, as follows:

   b.   For each hour or portion thereof for which an employee receives pay, the Employer shall make a contribution in accordance with the schedule in Article XXIX Section 1 to the above named Pension Fund and/or to the International Union of Painters and/or Allied Trades Union and Industry Annuity Plan.

   c.   For the purpose of this Article, each hour paid for, including hours attributable to show up time, and other hours for which pay is received by the employee in accordance with the Agreement, shall be counted as hours for which contributions are payable.

   d.   Contributions shall be paid on behalf of any employee starting with the employee's first day of employment in a job classification covered by this Agreement. This includes, but is not limited to, apprentices, helpers, trainees, and probationary employees.

   e.   The payments to the Pension Fund required above shall be made to the International Union of Painters and Allied Trades Union and Industry Pension Fund, which was established under an Agreement and Declaration of Trust, dated April 1, 1967. The Employer hereby agrees to be bound by and to the said Agreement and Declaration of Trust, as amended from time to time, as though he had actually signed the same.

2. The Employer hereby irrevocably designates as its representatives on the Board of Trustees

such Trustees as are now serving, or who will in the future serve, as Employer Trustees, together with their successors. The Employer further agrees to be bound by all actions taken by the Trustees pursuant to the said Agreement and Declaration of Trust, as amended from time to time.

3. All contributions shall be made at such time and in such manner as the Trustees require; and the Trustees may at any time conduct an audit in accordance with Article VI, Section 6 of the said Agreement and Declaration of Trust.

4. If an Employer fails to make contributions to the Pension Fund within twenty (20) days after the date required by the Trustees, the Union shall have the right to take whatever steps are necessary to secure compliance with this Agreement, any other provision hereof to the contrary notwithstanding, and the Employer shall be liable for all costs of collection of the payments due together with attorney fees and such penalties as may be assessed by the Trustees. The Employer's liability for payment under this Article shall not be subject to or covered by any grievance or arbitration procedure or any "no-strike" clause that may be provided or set forth elsewhere in this Agreement.

5. The Pension Plan and Annuity Plan adopted by the Trustees shall at all times conform with the requirements of the Internal Revenue Code so as to enable the Employer at all times to treat contributions to the International Union of Painters and Allied Trades Union and Industry Pension Fund as a deduction for income tax purposes.

## SECTION 3. THE PAINTERS AND ALLIED TRADES LABOR MANAGEMENT COOPERATION INITIATIVE

1. a. Commencing with the 1ST day of June 2006, and for the duration of the Agreement, and any renewals or extension thereof, the Employer agrees to make payments to The Painters and Allied Trades Labor Management Cooperation Initiative (LMCI) for each employee covered by this Agreement, as follows:

   b. For each hour or portion thereof, for which an employee receives pay, the Employer shall make a contribution of five (.05) cents to the Fund.

   c. For the purpose of this Article, each hour paid for, including hours attributable to show up time, and other hours for which pay is received by the employee in accordance with the Agreement, shall be counted as hours for which contributions are payable.

   d. Contributions shall be paid on behalf of any employee starting with the employee's first day of employment in a job classification covered by this Agreement. This includes, but is not limited to, apprentices, helpers, trainees, and probationary employees.

e.  The Employer and Union signatory to this Agreement agree to be bound by and to the Agreement and Declaration of Trust, as amended from time to time, establishing the Fund.

2. The Employer hereby irrevocably designates as its representatives on the Board of Trustees such Trustees as are now serving, or who will in the future serve, as Employer Trustees, together with their successors.

3. All contributions shall be made at such time and in such manner as the Trustees require; and the Trustees may at any time conduct an audit in accordance with the Agreement and Declaration of Trust.

4. If an Employer fails to make contributions to the Fund within twenty (20) days after the date required by the Trustees, the Union shall have the right to take whatever steps are necessary to secure compliance with this Agreement, any other provision hereof to the contrary notwithstanding, and the Employer shall be liable for all costs of collection of the payments due together with attorney fees and such penalties as may be assessed by the Trustees.  The Employer's liability for payment under this Article shall not be subject to or covered by any grievance or arbitration procedure or any "no-strike" clause which may be provided or set forth elsewhere in this Agreement.

**SECTION 4. HEALTH AND WELFARE FUND**

1.  The parties to this Agreement agree to maintain a Trust Fund known as the IUPAT District Council No. 51 Health and Welfare Fund.  The purpose of this Fund is to provide life insurance, sick benefits, hospitalization, medical fees, accident, surgical and dismemberment benefits for, but not limited to, eligible journeypersons, apprentices, and their families, in such form and amount as the Trustees of the Fund may determine.

2.  The Fund shall be administered pursuant to an Agreement and Declaration of Trust administered jointly by an equal number of representatives of the Employers and the Union, which Agreement and Declaration of Trust together with any amendments thereto which may be adopted shall be considered as part of this Agreement as though set forth here in full.  The parties to this Agreement agree to be bound by all actions taken by the Trustees pursuant to the Agreement and Declaration of Trust.

3.  The Employer agrees to contribute an amount for each hour worked, including overtime hours, by each journeyperson and apprentice, in their employ to the Trust Fund at such time and

in such manner as the Trustees require. The Trustees shall have the authority to have a representative selected by them audit the payroll and wage records of the Employer for the purpose of determining the accuracy of contributions to the Trust Fund. The contribution required herein shall be sent to the administrator of the Trust Fund in accordance with the schedule detailed in Article XXIX Section 1.

4. Each Employer may be required to have on deposit with the Trustees of the Trust Fund the sum of one thousand five hundred dollars ($1,500) or a Surety Bond in the amount of five thousand dollar ($5,000), as a minimum and not to exceed an amount of fifty thousand dollars ($50,000) on the date of signing this Agreement. In lieu of a "bond", a "Letter of Credit" or "Certified Check" to be held in escrow (no interest to be paid) will be acceptable. Once any of the acceptable forms of deposit have been made, the Employer will not be required to make such a deposit again, unless a violation for non-payment has been committed whereby the Trustees are required to file a claim against the original Bond, Certified Check or Letter of Credit, for which the Trustees may then order the Employer to post a new or higher deposit amount, or as the Trustees otherwise deem appropriate under the circumstances.

5. All Employers from jurisdictions other than the jurisdiction of District Council No. 51 may be required to deposit with the Trustees at the time they become parties to this Agreement the sum of one thousand five hundred dollars ($1,500) or a Surety Bond, Certified Check, or Letter of Credit in the amount of five thousand dollar ($5,000), as a minimum, and not to exceed an amount of fifty thousand dollars ($50,000) with the Trust Funds. Such Employers from other jurisdictions shall contribute to the Trust Fund currently an amount for each hour worked, including overtime hours each journeyperson and apprentice, including temporary employees in their employ; in accordance with the schedule detailed in Article XXIX Section 1; provided, however, that upon the completion of jobs to be performed within the jurisdiction of District Council No. 51, such deposit may be credited against the per hour contributions owed for the final period and the excess deposit, if any, as of the time of final payroll period shall be returned to the aforesaid Employer.

6. An Employer who fails to make contributions to this Trust Fund on the due date (25th of each month) and in the manner determined by the Trustees shall be considered to have violated this Agreement and may be rendered ineligible to hire members of the Union, as determined by the Union, provided that such ineligibility shall not serve to terminate this Agreement and shall not

relieve the Employer from its continuing obligation to comply with the terms of this Agreement. The Union and/or the Trustees shall have the right to take whatever steps are necessary to secure compliance with this Agreement, including the removal of manpower. The Employer shall be liable for all statutory remedies available under ERISA statute 29 U.S.C. 1132(g)(2), including interest, liquidated damages equal to 20% of the delinquent principal, audit costs, and all costs of collection of the payments due plus attorneys' fees and costs. The Employer's liability for payment of any amount under this Article shall not be subject to or covered by any grievance or arbitration procedure or any "no-strike" clause which may be set forth in this Agreement; however, the Trustees may in their discretion submit disputes regarding collections, liquidated damages and any and all amounts due to the Trust Funds to arbitration through the American Arbitration Association.

## SECTION 5. THE INTERNATIONAL UNION OF PAINTERS AND ALLIED TRADES JOINT APPRENTICESHIP AND TRAINING FUND (IUPAT-JATF)

The Agreement between the Employer(s) and Union parties to this agreement regarding payments to the International Union of Painters and Allied Trades Joint Apprenticeship and Training Fund (IUPAT-JATF) is as follows:

1.Commencing with the 1st day of June, 2006 and for the duration of this Agreement, and any renewals or extensions thereof, the Employer agrees to make payments to the International Union of Painters and Allied Trades Joint Apprenticeship and Training Fund (IUPAT-JATF) for each employee covered by this Agreement, as follows:

a) For each hour or portion of an hour for which an employee receives pay, the Employer shall make a contribution of five cents (.05) to the above named Apprenticeship Fund.

b) Contributions shall be paid on behalf of any employee starting with the employee's first hour of employment in a job classification covered by this Agreement.  This includes, but is not limited to, apprentices, journeypersons, and utility workers.

c) The payments to the Apprenticeship Fund required above should be made to the "International Union of Painters and Allied Trades Joint Apprenticeship and Training Fund (IUPAT-JATF)" which was established under an Agreement and Declaration of Trust, effective May 1, 1995. The Employer hereby agrees to be bound by and to said Agreement and Declaration of Trust as though it had actually signed the same.

2). The Employer hereby irrevocably designates as its representatives on the Board of Trustees of the International Fund (IUPAT-JATF) such Trustees as are now serving, or who will in the future serve, as Employer Trustees as are now serving, or who will in the future serve, as Employer Trustees, together with their successors, as provided for in the aforesaid Trust Indenture.

(a) The Union hereby irrevocably designates as its representatives on the Board of Trustees of the International Fund (IUPAT-JATF) such Trustees as are now serving, or who will in the future serve, as Labor Trustees, together with their successors, as provided for in the aforesaid Trust Indenture.

(b) The parties hereto further agree to be bound by all actions taken by the Trustees of the International Fund (IUPAT-JATF) pursuant to the said Agreement and Declaration of Trust.

3) All contributions shall be made at such time and in such manner as the Trustees require, and the Trustees shall have the authority to have a Certified Public Accountant audit the payroll and wage records of the Employer for the purpose of determining the accuracy of contributions to the Apprenticeship Fund.

4) If an Employer fails to make contributions to this Trust Fund on the due date (25th of each month) and in the manner determined by the Trustees, such failure shall be deemed a violation of this agreement, and the Union shall have the right to take whatever steps are necessary to secure compliance with this Agreement, and the Contractor shall be liable for all statutory remedies available under the ERISA statute, 29 U.S.C. 1132(g)(2), including interest, liquidated damages equal to 20% of the delinquent principal, audit costs, and all costs of collection including attorney's fees and costs. The Contractor's liability for payment under this Article shall not be subject to or covered by any grievance or arbitration procedure or any "no-strike" clause which may be provided or set forth elsewhere in this Agreement; however, the Trustees may in their discretion submit disputes regarding collections, liquidated damages and any and all amounts due to the Trust Funds to arbitration through the American Arbitration Association.

5) The Apprenticeship Plan adopted by the Trustees of said Apprenticeship Funds shall at all times conform with the requirements of the Internal Revenue Code and other applicable laws and

regulations so as to enable the Employer at all times to treat contributions to the Apprenticeship Fund as a deduction for income tax purposes.

## SECTION 6.  DISTRICT COUNCIL 51 JOINT APPRENTICESHIP TRAINING AND JOURNEYMAN EDUCATION PROGRAM

1. The District Council 51 Joint Apprenticeship Training and Journeyman Education Fund is hereby established for the sole purpose of training and educating apprentices and journeypersons. The fund shall be governed and controlled by the Board of Trustees of the District Council 51 Joint Apprenticeship Training and Journeyman Education Fund and will establish eligibility requirements for all applicants for apprenticeship.  Terms of apprenticeship shall be described in the Standards of the Training Committee(s).

2.    The Program for which the Fund is to be administered by the Board is as follows: To promote the Apprenticeship Training and Journeyman Education Program established and maintained by the parties to this fund by rendering assistance thereto by various means including the supplying of promotional materials for the Program, educational and training materials for use in conducting the Program, and administrative assistance in the conduct of the Program.

3.    The Employer hereby agrees to make contributions and deductions at the then current amounts as set forth in Article XXIX Section 1 for each hour or portion thereof, for which an employee receives pay and submit same to the District Council 51 Joint Apprenticeship Training and Journeyman Education Fund.

4.    An Employer who fails to make contributions to this Trust Fund on the due date (25th of each month) and in the manner determined by the Trustees shall be considered to have violated this Agreement and may be rendered ineligible to hire members of the Union, as determined by the Union, provided that such ineligibility shall not serve to terminate this Agreement and shall not relieve the Employer from its continuing obligation to comply with the terms of this Agreement. The Union or the Trustees shall have the right to take whatever steps are necessary to secure compliance with this Agreement, and the Employer shall be liable for all statutory remedies available under ERISA statute 29 U.S.C. 1132(g)(2), including interest, liquidated damages equal to 20% of the delinquent principal, audit costs, and all costs of collection of the payments due plus attorneys' fees and costs. The Employer's liability for payment of any amount under this Article shall not be subject to or covered by any grievance or arbitration procedure or any

"no-strike" clause which may be set forth in this Agreement; however, the Trustees may in their discretion submit disputes regarding collections, liquidated damages and any and all amounts due to the Trust Funds to arbitration through the American Arbitration Association.

5. CONDITIONS FOR WORKING APPRENTICES SHALL BE:

a. All apprentices shall be trained in accordance with both Federal and State Apprentice Regulations.

b. Any apprentice employed will be indentured within 90 days of the date employed. He or she at all times during the work shift will work under the supervision of a journeyperson. All apprentices must attend related instruction for a period of and at a place designated by the Joint Apprenticeship Committee(s) and Trustees. All Employers agree to and support the Committee's and/or Trustees' obligations and decisions on training and educating apprentices.

6. All signatory employers shall comply with all State and Federal laws, specifically, Federal Act, 29 Code of Federal Regulations-Part 30.

7. Each Employer shall employ and train apprentices at a ratio of one (1) apprentice to every three (3) journeypersons employed by the Employer, with approval of the District Council such ratio may be increased to one (1) apprentice to every one (1) journeyperson.

8. APPRENTICE WAGES, FRINGE BENEFITS AND DEDUCTIONS

Apprentices shall be paid a percentage of the Journeyperson's Base Rate with all then current fringe benefit contributions and deductions as set forth in Article XXIX Section 1. Apprentices shall be paid the "appropriate" percentage of the Journeyperson's wage rate as follows:

Painters/ Decorators/Wall Covers & Drywall Finishers

1st Year:

| | | |
|---|---|---|
| 1st 6 months | 60% |
| 2nd 6 months | 65% |

2nd Year

| | | |
|---|---|---|
| 1st 6 months | 70% |
| 2nd 6 months | 75% |

3rd Year

1st 6 months     80%

2nd 6 months     85%

9. The Employer hereby irrevocably designates as its representatives on the Board of Trustees such trustees as are now serving, or who will in the future serve, as employer trustees, together with their successors. The Employer further agrees to be bound by all actions taken by the trustees pursuant to the said Agreement and Declaration of Trusts, as amended from time to time.

10. If an Employer fails to make contributions to this Trust Fund on the due date (25th of each month) and in the manner determined by the Trustees, such failure shall be deemed a violation of this agreement, and the Union shall have the right to take whatever steps are necessary to secure compliance with this Agreement, and the Contractor shall be liable for all statutory remedies available under the ERISA statute, 29 U.S.C. 1132(g)(2), including interest, liquidated damages equal to 20% of the delinquent principal, audit costs, and all costs of collection including attorney's fees and costs. The Contractor's liability for payment under this Article shall not be subject to or covered by any grievance or arbitration procedure or any "no-strike" clause which may be provided or set forth elsewhere in this Agreement; however, the Trustees may in their discretion submit disputes regarding collections, liquidated damages and any and all amounts due to the Trust Funds to arbitration through the American Arbitration Association.

## SECTION 8. POLITICAL ACTION TOGETHER

The Employer(s) agree to deduct from employees' wages five cents ($0.05) per hour. This five cents ($0.05) per hour is to be contributed to the Political Action Together Fund of the International Union of Painters and Allied Trades. Employers party to this Agreement hereby agree to honor authorizations for check-off of political contributions from all employees who are Union members in the following form:

## AUTHORIZATION FORM FOR
## CHECK-OFF
## POLITICAL CONTRIBUTIONS

"I hereby authorize my employer to deduct from my pay the sum of five ($0.05) for each hour worked and to forward that amount to the PAT Political Committee, c/o International Union of Painters and Allied Trades, 1750 New York Avenue, N.W., Washington, D.C. 20006. This

authorization is signed freely and voluntarily and not out of any fear of reprisal and on the understanding that PAT Political Committee is engaged in a joint fund raising effort with the AFL-CIO, will use the money contributed to that effort to make political contributions and expenditures in connection with federal, state and local elections, and that this voluntary authorization may be revoked at any time by notifying my employer, PAT Political Committee and District Council No.\_\_\_\_ and/or Local Union No.\_\_\_\_\_ in writing of a desire to do so."

Name_____

Signature_____

Social Security _____

# ARTICLE XXII
## JOINT TRADE BOARD

1. A Joint Trade Board consisting of a minimum of four (4) and no more than five (5) members designated by the District Council and a minimum of four (4) and no more than five (5) members designated by the Employers is hereby established. It is agreed to add equal portions along with any other Employer the Union may in the future recognize, all decisions shall be decided by a majority vote of all present, of which shall be final and binding to all parties to this Agreement.

2. The members shall designate one to act as Chairman and one as Secretary, provided that every twelve (12) months the Chairman and Secretary shall be alternated between the Contractor and Union members of the Board.  Both parties shall designate alternates to attend Board meetings in the place of regular members who may be absent or against whom charges may be filed.  Not less than two (2) members (or their alternates) from each group must be present to constitute a quorum.  Each member (or alternate) present shall be entitled to one vote, but in no event shall the members from one group cast more votes than those from the other.  Members of the Board shall serve at the pleasure of the party making the designation.  It shall be the duty of the parties to fill vacancies within five (5) days after they occur.

3. The Board shall meet on the second Thursday every other month or any other times as designated by the Chairman and Secretary. The Board shall hold special meetings at the request of any member, within seven (7) working days of written notification.

4. The duties of the Board shall include the processing, investigation and determination of grievances, disputes and alleged violations of the Agreement.

5. The Joint Trade Board is empowered to hear and decide all grievances and disputes which arise between the parties as to the interpretation or application of this Agreement; to award or assess remedies, damages and penalties for violations of this Agreement; to issue interpretative rulings or other rules and regulations as it deems necessary to give force and effect to the purpose and intent of this Agreement; to investigate all grievances and disputes submitted to it, including the conducting of audits of Employer records; to recommend amendments to or changes in this Agreement, but only upon request of both parties; to appoint such persons or committees as may be necessary to aid the Board in the performance of its duties; and to demand of Employers who repeatedly violate this Agreement the posting of a cash or surety bond to assure future compliance.

6. No Board member shall sit as a Board member in any case involving themselves, directly or indirectly; and no Employer representative shall sit as a Board member in any case involving himself or herself or any of his or her employees, directly or indirectly.

7. Decisions, awards, or orders of the Joint Trade Board shall be final and binding.

8. The Board shall maintain full and complete records and minutes of its proceedings which records and minutes may be inspected at reasonable times by the parties to this Agreement when requested.

9. BETTERMENT OF THE INDUSTRY

All matters considered beneficial to the Industries, covered herein, not presently provided for in this Agreement, shall be referred to the Joint Trade Board for consideration and appropriate action for the betterment of the industry(s).

# ARTICLE XXIII
## GRIEVANCE AND ARBITRATION PROCEDURE

**SECTION 1. JURISDICTION OF PROCEDURES:**

All complaints, disputes, controversies, claims or grievances (hereinafter referred to as a dispute) arising between the parties to the Agreement involving questions of interpretation, application, or breach of any part of this Agreement, or arising out of the contractual relations between the parties and their respective members shall, be resolved in the following manner:

**Step 1** - In the first instance, the job or shop steward shall register a grievance with the foreman on the job. The Employer has three (3) working days to answer this grievance. If the grievance cannot be resolved at this step it shall proceed to Step 2.

**Step 2** - A District Council 51 Representative will meet with the foreman on the job. If the grievance cannot be resolved at this step within five (5) working days it shall proceed to Step 3.

**Step 3** - The Company Representative will meet with a committee appointed to hear this grievance at District Council 51's office. The Committee shall render a decision within three (3) working days of the meeting. If the Company does not agree with this opinion it has three (3) working days to write its reasons why it disagrees with the opinion of the Committee. If the Committee disagrees with the written response by the Company, the Business Manager/ Secretary Treasurer, will proceed to Step 4 and file for a Joint Trade Board Meeting.

**Step 4** - From the time that either party files for a "Joint Trade Board Meeting", the Board must convene within five (5) working days. The Joint Trade Board must render its decision within three (3) working days. The decision of the Board will be final and binding on the parties. If the Employer refuses to comply with a final and binding decision issued at the Joint Trade Board level, the District Council will have the right to direct Employees of such Employer to refrain from work. If the "Joint Trade Board" cannot resolve the grievance, at this level: either party can file for arbitration with the American Arbitration Association (AAA), within ten (10) working days. During the pendency of the Board's decision, there shall be no cessation of work of any type or description nor shall the Employer lock out any Employee.

**Step 5** - Arbitration

The American Arbitration Association will submit a panel of Arbitrators from whom the parties shall select an Impartial Chairman in accordance with the Rules and Regulations of the American Arbitration Association to hear the dispute. The decision of the Impartial Chairman shall be final and binding upon all parties to the proceedings and to this Agreement.

If an Employer fails to comply with an Arbitration Award within three (3) working days after it has been rendered, the Union shall have the right, aside from other legal remedies available to it, to direct the Employees of such Employer covered by this Agreement to refrain from working for such Employer as long as he has failed to comply with the Arbitration Award, and such

action by the Union and the Employees shall not be considered a breach or violation of this Agreement.

Upon issuance of the arbitrators decision any party found in violation of this Agreement shall pay all the costs of the arbitration including administrative fees and the cost of an arbitrator. This shall not include the legal fees of any party using the services of an attorney or any other professional service, which shall be the responsibility of the party (s) engaged.

With respect to any individual Employer that fails to comply with a final and binding decision issued at any level of this grievance procedure, the Union may terminate this Agreement by forty-eight (48) hours written notice to such Employer.

# ARTICLE XXIV
## MARKET RECOVERY, ORGANIZING AND MAINTENANCE OF WORK

**SECTION 1**

It is agreed to, that District Council 51 exclusively has full authority to modify the terms and/or conditions of this Agreement with Employers and/or owners for the purposes of obtaining, maintaining and/or organizing work opportunities for the members and crafts the IUPAT represents for any specific job sites, and/or types of work.

**SECTION 2**

The market recovery, organizing, and maintenance of work language and rates of pay shall not be utilized on any category of work, for any trades where the work historically was being performed by members of the Union and/or signatory employers, where any union funds of any type or source are involved in funding the project, where prevailing rates apply that are equal to or greater than the non-market recovery rates for journeypersons in the Collective Bargaining Agreement; and on work which can be maintained by the Employer and the Union at the historically established rates and conditions.

**SECTION 3**

It is agreed that Employers signatory to the Collective Bargaining Agreement will in no way discriminate, intimidate, threaten any disciplinary action such as job loss, or be used as a condition of employment against all present and future employees refusing to work under the guidelines of this Article or any other modified wage and fringe benefit package.

**SECTION 4**

The market recovery, organizing and maintenance of work language is to be used to organize new work opportunities, recover work formerly performed by Union members and Employers, and/or to maintain present work opportunities for our members.

**SECTION 5**

Any Employer signatory to this Collective Bargaining Agreement shall notify the District Council not less than two (2) working days prior to the bidding of a Market Recovery job, so as to provide the District Council with an opportunity to investigate whether the job in question qualifies for payment of Market Recovery rates.

In the event that the District Council believes that an Employer has improperly designed a job as receiving Market Recovery rates, then the District Council may submit a grievance pursuant to the Grievance Arbitration Procedure set forth in this Collective Bargaining Agreement.

The burden of proof in any arbitration concerning the applicability of Market Recovery rates shall be on the Employer to establish that the payment of Market Recovery rates on the job in question is proper. In the event that the Employer loses such arbitration, then the Employer shall be responsible for all fees of the American Arbitration Association, the fees and expenses and legal fees of the Council. Further, the Employer shall pay to the employees who performed the work on said job the full wage and benefit levels provided for in this Collective Bargaining Agreement.

**The terms and conditions for market recovery shall be as follows:**

- There shall be no restriction on tools or production
- There shall be no shift differentials
- Workweek shall be Monday through Sunday, inclusive. All work in excess of forty hours shall be paid at time and one half.
- Four (4) ten (10) hour days shall be allowed when needed.
- Utility worker ratio shall be three (3) to one (1), or as low as one (1) to one (1), one utility worker for every Painter by mutual consent.

# ARTICLE XXV
## CHECK-OFF OF ADMINISTRATIVE DUES

**SECTION 1.**  Every Employer signatory to this Agreement hereby agrees to check-off from the wages of any employee employed by such Employer during the term of this Agreement administrative dues in the amount specified in the District Council's bylaws and to remit said amount to the Union in the following manner:

a. The Union will notify the Employer in writing of the amount of administrative dues specified in the bylaws, and will submit to the Employer a copy of the District Council by-laws or the applicable by-law provision upon request.

b. For each payroll period, the Employer will deduct from the total gross wages of each employee the amount specified in the by-laws based on the percentage of the then current total weekly gross wages during said payroll period, and will accumulate said deductions to the end of the month.

c. On or before the 25th day of each month, the Employer will remit to the Union the entire amount of administrative dues due and owing as to each employee for the month previous, together with a list of employees covered hereby and the number of hours worked by each during the applicable period.

**SECTION 2.**  When a signatory Employer performs a job within the jurisdiction of a union affiliated with the International Union of Painters and Allied Trades other than the Union signatory hereto and the by-laws of that other union contain a provision for administrative dues or business representative "assessment," the Employer shall check-off from the wages of employees covered by this Agreement and employed on that job administrative dues or business representative "assessment" in the amount stated in that other union's by-laws, and shall remit said amount to that other Union.  In that event, that other Union shall be acting as agent of the signatory union for the purpose of policing and administering this Agreement.  In performing the check-off, the procedure specified in Section 1 a-c will be followed, except that it shall be the responsibility of said other Union to notify the Employer in writing of the amount of administrative dues or business representative "assessment" specified in its by-laws, and to submit to the Employer a copy of the by-laws or the applicable by-law provision.  When the signatory Employer performs a job within the jurisdiction of a Union affiliated with the International Union of Painters and Allied Trades other than the Union signatory hereto, and the

by-laws of that other Union contain no provision for administrative dues or business representative "assessment," the Employer shall continue to be bound by Section 1.

**SECTION 3.** The obligations of the Employer under Section 1 and 2 shall apply only as to employees who have voluntarily signed a valid dues deduction authorization card.

**SECTION 4.** At the time of the employment of any employee, the Employer will submit to each such employee for his voluntary signature a dues deduction authorization card in triplicate, one copy of which is retained by the Employer, one copy retained by the employee, and the other returned to the Union, the form to be supplied such Employer by the Union.

**SECTION 5.** On or before the 25th day of each month, the Employer will submit to the Union a list of all employees covered by the Agreement who have not signed a dues deduction authorization card, together with the number of hours worked by each such employee during the month previous.

### ARTICLE XXVI
### DURATION CLAUSE

**SECTION 1.** This Agreement shall be in full force and effect for all parties signatory to this Agreement from June 1, 2006 to and including May 31, 2010 and shall continue from year to year thereafter unless written notice of desire to cancel or terminate the Agreement is served by either party upon the other not less than sixty (60) and not more than ninety (90) days prior to the expiration date of any subsequent contract year.

**SECTION 2.** Where no such cancellation or termination notice is served and the parties desire to continue said Agreement, but also desire to negotiate changes or revisions in this Agreement, either party may serve upon the other a written notice not less than sixty (60) and not more than ninety (90) days prior to the expiration date, of any subsequent contract year, advising that such party desires to revise or change terms or conditions of such Agreement. The respective parties shall be permitted all legal or economic recourse to support their requests for revisions if the parties fail to agree thereon. Nothing herein shall preclude the parties from making revisions or changes in this Agreement, by mutual consent, at any time during its term.

# PAINTERS, DECORATORS, PAPERHANGERS, AND DRYWALL FINISHERS TRADE SPECIFICS AND WORKING CONDITIONS

# ARTICLE XXVII
## GEOGRAPHIC JURISDICTION

**SECTION 1.**  The geographic jurisdiction of District Council No. 51 shall be as follows: all of the District of Columbia; the following counties in the State of Maryland:  Baltimore, Prince George's, Montgomery, Calvert, Charles, St. Mary's, Anne Arundel, Harford, Cecil, Kent, Queen Anne's, Caroline, Talbot, Dorchester, Wicomico, Worcester, Somerset, Washington, Howard, Frederick, Carroll and the independent city of Baltimore; the independent cities in the State of Virginia including: Arlington, Alexandria, Norfolk, Portsmouth, Virginia Beach, Chesapeake, Suffolk, Newport News, Hampton, Richmond;  the following counties in the State of Virginia: Accomack, Albemarle, Amelia, Appomattox, Arlington, Brunswick, Buckingham, Caroline, Charles City, Charlotte, Chesterfield, Culpeper, Cumberland, Dinwiddie, Essex, Fairfax, Fauquier, Fluvanna, Goochland, Gloucester, Greene, Greensville, Isle of Wight, Hanover, Henrico, James City, King and Queen, King George, King William, Lancaster, Louisa, Loudon, Lunenburg, Madison, Mathews, Mecklenburg, Middlesex, New Kent, Northampton, Northumberland, Nottoway, Orange, Powhatan, Prince Edward, Prince George, Prince William, Rappahannock, Richmond, Southampton, Spotsylvania, Stafford, Surry, Sussex, Westmoreland and York.

**SECTION 2.**  For the purpose of this Agreement the Washington, D.C., Maryland and Northern Virginia area will be defined as:  City of Washington, DC; and the following counties in the State of Virginia:  Arlington, Fairfax, Fauquier, Loudon, Prince William, Stafford; and the following counties in Maryland:  Prince George's, Montgomery, Calvert, Charles, St. Mary's.

**SECTION 3.**   For the purpose of this Agreement the Baltimore area will be defined as: including the City of Baltimore and the following counties: Baltimore, Anne Arundel, Harford, Cecil, Kent, Queen Anne's, Caroline, Talbot, Dorchester, Wicomico, Worcester, Somerset, Washington, Howard, Frederick, Carroll.

**SECTION 4.**  For the purpose of this Agreement the Richmond, Norfolk, Southern Virginia area will be defined as: including the cities of Richmond, Norfolk, Portsmouth, Virginia Beach, Chesapeake, Suffolk, Newport News and Hampton; and the following counties in Virginia: Accomack, Albemarle, Amelia, Appomattox, Arlington, Brunswick, Buckingham, Caroline, Charles City, Charlotte, Chesterfield, Culpeper, Cumberland, Dinwiddie, Essex, Fluvanna, Gloucester, Goochland, Greene, Greensville, Hanover, Henrico, Isle of Wight, James City, King

and Queen, King George, King William, Lancaster, Louisa, Lunenburg, Madison, Mathews, Mecklenburg, Middlesex, New Kent, Northampton, Northumberland, Nottoway, Orange, Powhatan, Prince Edward, Prince George, Rappahannock, Richmond, Spotsylvania, Surry, Sussex, Westmoreland and York.

**SECTION 5.** If during the life of this Agreement the General Executive Board of the International Union of Painters and Allied Trades adds or subtracts from the territory of District Council No. 51 then this Agreement shall be deemed modified to reflect such changes.

## ARTICLE XXVIII
### HOURS OF WORK, HOLIDAYS AND OVERTIME

**SECTION 1.** In an effort to expand work opportunities for all members of District Council No. 51 and since conditions beyond the control of the Employer may effect starting and quitting times and days of work, the following work schedule shall apply for all work: The Employer may establish any eight (8) hour shift within a twenty-four (24) hour period at straight time wages. Eight (8) hours shall constitute a day's work. All work over eight (8) hours in any one (1) day shall be paid at the rate of time and one-half the regular straight time wages. The work week shall be Monday through Saturday inclusive. All hours of work over forty (40) in one week shall be paid at the rate of time and one-half the regular straight time wages. All work performed on Sunday and Holidays shall be paid at the rate of time and one-half the regular straight time wages. The Employer may establish a four (4) day ten (10) hours per day work week at straight time wages where legal. Overtime shall be paid at the rate of time and one-half the regular straight time wages after ten (10) hours work in one day or after forty (40) hours work in one week, when working a four (4) day ten (10) hours per day schedule.

**SECTION 2.** All overtime work as specified above shall at all times be reported to the District Council No. 51 office. The Union shall be entitled to inspect the Contractor's books to determine actual overtime payments.

**SECTION 3.** Overtime work is to be offered first to the members who are working on the job during the regular workweek. There will be no reprisals against any member who refuses to work overtime.

**SECTION 4.** The following days shall be observed as holidays: New Year's Day, Martin Luther King's Birthday, Decoration (Memorial) Day, Independence Day (Fourth of July), Labor

Day, Veterans' Day, Thanksgiving Day and the day after Thanksgiving, and Christmas Day. Any holidays that fall on Sunday shall be observed on Monday and any holidays that fall on Saturday shall be celebrated on Friday. Under no circumstances shall any work be performed on Labor Day.

Overtime shall be paid for all time worked in excess of eight hours (8) in any one day, or forty (40) hours in any one week, except where there is a holiday during that week, in which case, overtime shall be paid after an employee has worked in excess of thirty-two (32) hours in a four (4) day workweek, or twenty-four (24) hours in a three day workweek. When work is performed on a holiday, the overtime rate of wages shall be paid according to the schedule outline above.

**SECTION 5.** Election Day

On General Election Day in November all Employees may stop work after four (4) hours work and get paid eight (8) hours wages and four (4) hours on the fringe benefits. Sign-up for election poles must be completed at District Council 51's offices, on Election Day. If an employee does not work the polls, it is a normal workday. The Employer(s) will have a right to verify these records.

# ARTICLE XXIX
## WAGES AND FRINGE BENEFIT CONTRIBUTIONS

**SECTION 1. WAGE & FRINGE BENEFITS**

Any portion of the negotiated increase(s) provided herein will be allocated at the proper time intervals at the District Council's discretion for the duration this Agreement. The following schedule reflects changes effective June 1, 2006:

# THE WASHINGTON DC, MARYLAND AND NORTHERN VIRGINIA AREA WAGES, FRINGE BENEFIT CONTRIBUTIONS AND DEDUCTIONS

**JURISDICTION**- For the purpose of this Agreement the Washington, D.C. area will be defined as: City of Washington, DC; the following independent cities in the State of Virginia: Alexandria and Arlington; and the following counties in the State of Virginia: Fairfax, Fauquier, Loudon, Prince William, Stafford; and the following counties in the State of Maryland: Prince George's, Montgomery, Calvert, Charles, St. Mary's.

## HOURLY WAGES

| | EFFECTIVE | EFFECTIVE | EFFECTIVE | EFFECTIVE |
|---|---|---|---|---|
| **JOURNEYPERSON PAINTER** | 6/1/2006 | 6/1/2007 | 6/1/2008 | 6/1/2009 |
| Bridges/Heavy Highway/Lead Abatement & Flame/Thermal Spray | $26.37 | $1.50 Increase | $1.50 Increase | $1.50 Increase |
| Industrial | $23.48 | $1.25 Increase | $1.25 Increase | $1.25 Increase |
| Specialty | $23.06 | $1.25 Increase | $1.25 Increase | $1.25 Increase |
| Commercial/ Mold Remediation | $22.06 | $1.25 Increase | $1.25 Increase | $1.25 Increase |
| Residential/Government Housing | $19.93 | $1.25 Increase | $1.25 Increase | $1.25 Increase |
| | | | | |
| **JOURNEYPERSON DRYWALL FINISHER** | | | | |
| Commercial | $22.06 | $1.25 Increase | $1.25 Increase | $1.25 Increase |
| **JOURNEYPERSON WALLCOVERER** | | | | |
| Commercial | $22.06 | $1.25 Increase | $1.25 Increase | $1.25 Increase |

Piece Work: $3.00 Vinyl, $4.00 Fabric, plus 8 hours of Fringe Benefit contributions per shift

**APPRENTICE PAINTER, DRYWALL FINISHER & WALLCOVERER** - Based on Journeyperson wage rate

| | | |
|---|---|---|
| First six months | - 60% of Journeyperson rate | $13.24 |
| Second six months | - 65% of Journeyperson rate | $14.34 |
| Third six months | - 70% of Journeyperson rate | $15.44 |
| Fourth six months | - 75% of Journeyperson rate | $16.55 |
| Fifth six months | - 80% of Journeyperson rate | $17.65 |
| Sixth six months | - 85% of Journeyperson rate | $18.75 |

## FRINGE BENEFITS CONTRIBUTIONS are as follows:

| | JOURNEYPERSON | APPRENTICE | | | | | |
|---|---|---|---|---|---|---|---|
| | | 1st 6 mo | 2nd 6 mo | 3rd 6 mo | 4th 6 mo | 5th 6 mo | 6th 6 mo |
| IUPAT DC 51 Health & Welfare Fund | $4.21 per hour | $4.21 | $4.21 | $4.21 | $4.21 | $4.21 | $4.21 |
| IUPAT Industry Pension Fund | $2.40 per hour | $ .20 | $ .20 | $ .25 | $ .25 | $ .25 | $ .25 |
| DC 51 JATF | $ .65 per hour | $ .65 | $ .65 | $ .65 | $ .65 | $ .65 | $ .65 |
| IUPAT JATF | $ .05 per hour | $ .05 | $ .05 | $ .05 | $ .05 | $ .05 | $ .05 |
| LMCI | $ .05 per hour | $ .05 | $ .05 | $ .05 | $ .05 | $ .05 | $ .05 |

## EMPLOYEE DEDUCTIONS are as follows:

| | |
|---|---|
| Administrative Dues Check-off: | Dues shall be deducted at the rate of five percent (5.0%) of all gross wages |
| Political Action Together: | $ .05 per hour |
| Organizing Fund: | $ .05 per hour |

## IN ADDITION

| | |
|---|---|
| Foreman (3 men) | $1.00 per hour |
| Foreman (4 to 15 men) | $2.00 per hour |
| Foreman (16 or more) | $4.00 per hour |
| | |
| Height Pay | $1.00 per hour (see Art. XXIX, Sect. 12 for applicability) |

# THE BALTIMORE AREA
## WAGES, FRINGE BENEFIT CONTRIBUTIONS AND DEDUCTIONS

**JURISDICTION**- For the purpose of this Agreement the Baltimore area will be defined as: including the City of Baltimore and the following counties: Baltimore, Anne Arundel, Harford, Cecil, Kent, Queen Ann's, Caroline, Talbot, Dorchester, Wicomico, Worcester, Somerset, Washington, Howard, Frederick, and Carroll.

## HOURLY WAGES

| | EFFECTIVE | EFFECTIVE | EFFECTIVE | EFFECTIVE |
|---|---|---|---|---|
| **JOURNEYPERSON PAINTER** | 6/1/2006 | 6/1/2007 | 6/1/2008 | 6/1/2009 |
| Bridges/Heavy Highway/Lead Abatement & Flame/Thermal Spray | $26.37 | $1.50 Increase | $1.50 Increase | $1.50 Increase |
| Industrial | $23.48 | $1.25 Increase | $1.25 Increase | $1.25 Increase |
| Specialty | $23.06 | $1.25 Increase | $1.25 Increase | $1.25 Increase |
| Commercial/ Mold Remediation | $22.06 | $1.25 Increase | $1.25 Increase | $1.25 Increase |
| Residential/Government Housing | $19.93 | $1.25 Increase | $1.25 Increase | $1.25 Increase |
| | | | | |
| **JOURNEYPERSON DRYWALL FINISHER** | | | | |
| Commercial | $22.06 | $1.25 Increase | $1.25 Increase | $1.25 Increase |
| **JOURNEYPERSON WALLCOVERER** | | | | |
| Commercial | $22.06 | $1.25 Increase | $1.25 Increase | $1.25 Increase |

Piece Work: $3.00 Vinyl, $4.00 Fabric, plus 8 hours of Fringe Benefit contributions per shift

**APPRENTICE  PAINTER, DRYWALL FINISHER & WALLCOVERER** - Based on Journeyperson wage rate

| | | |
|---|---|---|
| First six months    - 60% of Journeyperson rate | $13.24 |
| Second six months - 65% of Journeyperson rate | $14.34 |
| Third six months   - 70% of Journeyperson rate | $15.44 |
| Fourth six months - 75% of Journeyperson rate | $16.55 |
| Fifth six months    - 80% of Journeyperson rate | $17.65 |
| Sixth six months   - 85% of Journeyperson rate | $18.75 |

## FRINGE BENEFITS CONTRIBUTIONS are as follows:

| | JOURNEYPERSON | APPRENTICE | | | | | |
|---|---|---|---|---|---|---|---|
| | | 1st 6 mo | 2nd 6 mo | 3rd 6 mo | 4th 6 mo | 5th 6 mo | 6th 6 mo |
| IUPAT DC 51 Health & Welfare Fund | $4.21 per hour | $4.21 | $4.21 | $4.21 | $4.21 | $4.21 | $4.21 |
| IUPAT Industry Pension Fund | $2.40 per hour | $ .20 | $ .20 | $ .25 | $ .25 | $ .25 | $ .25 |
| DC 51 JATF | $ .65 per hour | $ .65 | $ .65 | $ .65 | $ .65 | $ .65 | $ .65 |
| IUPAT JATF | $ .05 per hour | $ .05 | $ .05 | $ .05 | $ .05 | $ .05 | $ .05 |
| LMCI | $ .05 per hour | $ .05 | $ .05 | $ .05 | $ .05 | $ .05 | $ .05 |

## EMPLOYEE DEDUCTIONS are as follows:

| | |
|---|---|
| Administrative Dues Check-off: | Dues shall be deducted at the rate of five percent (5.0%) of all gross wages |
| Political Action Together: | $ .05 per hour |
| Organizing Fund: | $ .05 per hour |

## IN ADDITION

| | |
|---|---|
| Foreman (3 men) | $1.00 per hour |
| Foreman (4 to 15 men) | $2.00 per hour |
| Foreman (16 or more) | $4.00 per hour |
| | |
| Height Pay | $1.00 per hour (see Art. XXIX, Sect. 12 for applicability) |

## THE RICHMOND, NORFOLK, & SOUTHERN VIRGINIA AREA
## WAGES, FRINGE BENEFIT CONTRIBUTIONS AND DEDUCTIONS

**JURISDICTION**- For the purpose of this Agreement the Richmond, Norfolk, Southern Virginia and North Carolina area will be defined as: including the independent cities in the State of Virginia: Richmond, Norfolk, Portsmouth, Virginia Beach, Chesapeake, Suffolk, Newport News and Hampton; and the following counties in the State of Virginia: Accomack, Albemarle, Amelia, Appomattox, Brunswick, Buckingham, Caroline, Charles City, Charlotte, Chesterfield, Culpeper, Cumberland, Dinwiddie, Essex, Fluvanna, Gloucester, Goochland, Greene, Greensville, Hanover, Henrico, Isle of Wight, James City, King and Queen, King George, King William, Lancaster, Louisa, Lunenburg, Madison, Mathews, Mecklenburg, Middlesex, New Kent, Northampton, Northumberland, Nottoway, Orange, Powhatan, Prince Edward, Prince George, Rappahannock, Richmond, Southampton, Spotsylvania, Surry, Sussex, Westmoreland and York.

| HOURLY WAGES | EFFECTIVE | EFFECTIVE | EFFECTIVE | EFFECTIVE |
|---|---|---|---|---|
| **JOURNEYPERSON PAINTER** | **6/1/2006** | **6/1/2007** | **6/1/2008** | **6/1/2009** |
| Bridges/Heavy Highway/Lead Abatement & Flame/Thermal Spray | $21.10 | $1.50 Increase | $1.50 Increase | $1.50 Increase |
| Industrial | $17.37 | $1.25 Increase | $1.25 Increase | $1.25 Increase |
| Specialty | $16.87 | $1.25 Increase | $1.25 Increase | $1.25 Increase |
| Commercial/ Mold Remediation | $15.87 | $1.25 Increase | $1.25 Increase | $1.25 Increase |
| Residential/Government Housing | $14.26 | $1.25 Increase | $1.25 Increase | $1.25 Increase |
| | | | | |
| **JOURNEYPERSON DRYWALL FINISHER** | | | | |
| Commercial | $15.87 | $1.25 Increase | $1.25 Increase | $1.25 Increase |
| **JOURNEYPERSON WALLCOVERER** | | | | |
| Commercial | $15.87 | $1.25 Increase | $1.25 Increase | $1.25 Increase |

Piece Work: $3.00 Vinyl, $4.00 Fabric, plus 8 hours of Fringe Benefit contributions per shift

**APPRENTICE PAINTER, DRYWALL FINISHER & WALLCOVERER** - Based on Journeyperson wage rate

| | | |
|---|---|---|
| First six months | - 60% of Journeyperson rate | $ 9.52 |
| Second six months | - 65% of Journeyperson rate | $10.32 |
| Third six months | - 70% of Journeyperson rate | $11.11 |
| Fourth six months | - 75% of Journeyperson rate | $11.90 |
| Fifth six months | - 80% of Journeyperson rate | $12.70 |
| Sixth six months | - 85% of Journeyperson rate | $13.49 |

**FRINGE BENEFITS CONTRIBUTIONS** are as follows:

| | JOURNEYPERSON | APPRENTICE | | | | | |
|---|---|---|---|---|---|---|---|
| | | 1st 6 mo | 2nd 6 mo | 3rd 6 mo | 4th 6 mo | 5th 6 mo | 6th 6 mo |
| IUPAT DC 51 Health & Welfare Fund | $4.21 per hour | $4.21 | $4.21 | $4.21 | $4.21 | $4.21 | $4.21 |
| IUPAT Industry Pension Fund | $1.70 per hour | $ .20 | $ .20 | $ .25 | $ .25 | $ .25 | $ .25 |
| DC 51 JATF | $ .65 per hour | $ .65 | $ .65 | $ .65 | $ .65 | $ .65 | $ .65 |
| IUPAT JATF | $ .05 per hour | $ .05 | $ .05 | $ .05 | $ .05 | $ .05 | $ .05 |
| LMCI | $ .05 per hour | $ .05 | $ .05 | $ .05 | $ .05 | $ .05 | $ .05 |

## EMPLOYEE DEDUCTIONS are as follows:

| | |
|---|---|
| Administrative Dues Check-off: | Dues shall be deducted at the rate of five percent (5.0%) of all gross wages |
| Political Action Together: | $ .05 per hour |
| Organizing Fund: | $ .05 per hour |

## IN ADDITION

| | |
|---|---|
| Foreman (3 men) | $1.00 per hour |
| Foreman (4 to 15 men) | $2.00 per hour |
| Foreman (16 or more) | $4.00 per hour |
| | |
| Height Pay | $1.00 per hour (see Art. XXIX, Sect. 12 for applicability) |

# WASHINGTON & BALTIMORE
## ENTRY LEVEL JOURNEYPERSON
### WAGES, FRINGE BENEFIT CONTRIBUTIONS & DEDUCTIONS

## HOURLY WAGES

|  | EFFECTIVE 6/1/2006 |
|---|---|
| ENTRY LEVEL I | $14.50 |
| ENTRY LEVEL II | $16.50 |
| ENTRY LEVEL III | $18.50 |

## FRINGE BENEFITS CONTRIBUTIONS are as follows:

| | |
|---|---|
| IUPAT DC 51 Health & Welfare Fund | $3.00 per hour |
| IUPAT Industry Pension Fund | $ .90 per hour |
| DC 51 JATF | $ .65 per hour |
| IUPAT JATF | $ .05 per hour |
| LMCI | $ .05 per hour |

## EMPLOYEE DEDUCTIONS are as follows:

| | |
|---|---|
| Administrative Dues Check-off: | Dues shall be deducted at the rate of five percent (5.0%) of all gross wages |
| Political Action Together: | $ .05 per hour |
| Organizing Fund: | $ .05 per hour |

# WASHINGTON & BALTIMORE
## MARKET RECOVERY
### WAGES, FRINGE BENEFIT CONTRIBUTIONS & DEDUCTIONS

## HOURLY WAGES

|  | EFFECTIVE 6/1/2006 |
|---|---|
| PAINTER, DRYWALL FINISHER & WALLCOVERER | $14.50 |
| UTILITY WORKER | $9.00 to $13.00 |

## FRINGE BENEFITS CONTRIBUTIONS are as follows:

| | PAINTER | UTILITY WORKER |
|---|---|---|
| IUPAT DC 51 Health & Welfare Fund | $3.00 per hour | NO CONTRIBUTION |
| IUPAT Industry Pension Fund | $ .65 per hour | |
| DC 51 JATF | $ .25 per hour | |
| IUPAT JATF | $ .05 per hour | |
| LMCI | $ .05 per hour | |

## EMPLOYEE DEDUCTIONS are as follows:

| | |
|---|---|
| Administrative Dues Check-off: | Dues shall be deducted at the rate of five percent (5.0%) of all gross wages |
| Political Action Together: | $ .05 per hour |
| Organizing Fund: | $ .05 per hour |

## NORFOLK & RICHMOND
## ENTRY LEVEL JOURNEYPERSON
## WAGES, FRINGE BENEFIT CONTRIBUTIONS & DEDUCTIONS

### HOURLY WAGES

**EFFECTIVE**

**6/1/2006**

| | |
|---|---|
| ENTRY LEVEL I | $10.50 |
| ENTRY LEVEL II | $12.50 |
| ENTRY LEVEL III | $14.50 |

### FRINGE BENEFITS CONTRIBUTIONS are as follows:

| | |
|---|---|
| IUPAT DC 51 Health & Welfare Fund | $3.00 per hour |
| IUPAT Industry Pension Fund | $ .90 per hour |
| DC 51 JATF | $ .65 per hour |
| IUPAT JATF | $ .05 per hour |
| LMCI | $ .05 per hour |

### EMPLOYEE DEDUCTIONS are as follows:

| | |
|---|---|
| Administrative Dues Check-off: | Dues shall be deducted at the rate of five percent (5.0%) of all gross wages |
| Political Action Together: | $ .05 per hour |
| Organizing Fund: | $ .05 per hour |

## NORFOLK & RICHMOND
## MARKET RECOVERY
## WAGES, FRINGE BENEFIT CONTRIBUTIONS & DEDUCTIONS

### HOURLY WAGES

**EFFECTIVE**

**6/1/2006**

| | |
|---|---|
| PAINTER, DRYWALL FINISHER & WALLCOVERER | $10.50 |
| UTILITY WORKER | $9.00 to $13.00 |

### FRINGE BENEFITS CONTRIBUTIONS are as follows:

| | PAINTER | UTILITY WORKER |
|---|---|---|
| IUPAT DC 51 Health & Welfare Fund | $3.00 per hour | NO CONTRIBUTION |
| IUPAT Industry Pension Fund | $ .65 per hour | |
| DC 51 JATF | $ .25 per hour | |
| IUPAT JATF | $ .05 per hour | |
| LMCI | $ .05 per hour | |

### EMPLOYEE DEDUCTIONS are as follows:

| | |
|---|---|
| Administrative Dues Check-off: | Dues shall be deducted at the rate of five percent (5.0%) of all gross wages |
| Political Action Together: | $ .05 per hour |
| Organizing Fund: | $ .05 per hour |

**SECTION 3. Bridge, Overpass and Heavy Highway**

Will include but not be limited to; any and all work/processes to be performed on all bridges, overpasses, viaducts, dams, all heavy and highway and appurtenances.

**SECTION 4. Industrial**

Will include but not limited to; any and all work/processes to be performed at refineries, tanks, hangers, ceiling over 60 feet, manufacturing and power facilities, steel mills, towers, poles, stacks, steeples, structural steel, etc., and or any work, that would require cables as a platform to perform assigned work.

**SECTION 5. Commercial: New Construction/Major Alteration/ Repaint-Remodeling**

Will include but not limited to; any and all work/processes to be performed at all office buildings, warehouses, schools, hospitals, museums, theaters of any kind, malls, department stores, food stores, supply houses, depots, strip malls, churches, retirement homes, apartment buildings, condominiums, hotels, motels, restaurants, commercial culinary facilities, stadiums, etc.

**New Construction** is work built from the ground up and is bid through a General Contractor or Construction Manager.  Major Alteration is work where a General Contractor or Construction Manager is involved, and a majority of all of the other trades are on the jobsite.  The original or existing character or configuration are to be changed.

**Repaint-Remodel** is work on existing properties or structures, which previously has been finished or remodeled.  Work performed where signatory Employer is the prime contractor or they are working through a general contractor or construction manager and no other trades or a minority of the trades are involved.

**SECTION 6. Residential and Government Housing**

The following work shall be paid at the residential government housing rate of pay: all residential single and multi-family dwellings, sub-division tract housing, condominiums, apartments, schools, government housing and non-industrial work on military installations.

**SECTION 7.** On all Davis-Bacon work the Employer agrees to pay the applicable wage in this Agreement when it is higher than the posted Davis-Bacon rate.   The wage rate shall apply for the duration of the job; fringe benefits contributions will be paid at the then current amount

**SECTION 8.** Whenever there is a dispute with respect to rates of pay of employees or with respect to the proper crediting of dues checked off by the Employer, the contractor and the Union

agree upon request to produce for inspection any books and records maintained by either party which may be relevant to the resolution of the dispute.

**SECTION 9.**    On all construction jobs where the work is performed at the job site and three (3) men are used, one of the Journeyperson Painters on such jobs will be placed in charge of the particular job by the Employer or his representative and said Journeyperson Painter shall receive one ($1.00) dollar an hour more than the regular wage while he is acting in that capacity.

On all construction jobs where the work is performed at the job site and four (4) or more and up to fifteen (15) men are used, one of the Journeyperson Painters on such jobs will be placed in charge of the particular job by the Employer or his representative and said Journeyperson Painter shall receive two ($2.00) dollars an hour more than the regular wage while he is acting in that capacity.

On all construction jobs where the work is performed at the job site and sixteen or more (16 +) men are used, one of the Journeyperson Painters on such jobs will be placed in charge of the particular job by the Employer or his representative and said Journeyperson Painter shall receive four ($4.00) dollars an hour more than the regular wage while he is acting in that capacity.

**SECTION 10.**    A Shopman shall be used on the job-site where fifteen (15) or more employees are employed. He shall receive sixty cents ($0.60) per hour above the Journeyman wage in the category he would be working with.  Shopmen and Foremen shall be permitted to report on the job fifteen (15) minutes before starting time and remain fifteen (15) minutes later than regular quitting time.  All shop work in excess of allotted fifteen (15) minutes shall be paid for at the prevailing overtime rate or rates, as per Agreement.

**SECTION 11.**    Employees shall be paid either by direct deposit, postal delivery, or on the job-site weekly each Friday, not later than the close of the regular work day and not more than five (5) days' wages may be withheld at any time. The Employer has up to five (5) business days to process and pay their employees after the close of their regular payroll period. Any employee not receiving pay by the end of the regular work week shall be entitled to receive overtime for each hour worked thereafter until paid, except in a case of an emergency. Any employee not receiving their pay and are required to go to the Employer's shop or office to receive pay shall be allowed sufficient time to travel to the Employer's shop or office, at the Employer's expense and also receive mileage from the job to the shop.

All wages shall be paid in cash or negotiable check and shall be accompanied by a statement of gross earnings and any deductions legally made. Such statement shall show the Employer's name, the employee's name, the hourly rate of pay, the dates and hours worked, all deductions made and the net amount due the employee. Wage payments shall conform with all applicable federal and state laws.

**SECTION 12.** On all Commercial construction sites any employee working on suspended scaffolding, aerial boom lifts, scissor lifts that extend forty (40) feet or over, scaffolding and ladders that extend forty (40) feet or over will be paid one ($1.00) dollar additional per hour, provided the employee has the appropriate certifications.

## ARTICLE XXX
## WORKING CONDITIONS

**SECTION 1.** There shall be unlimited use of all tools provided all local, state, and federal safety laws and regulations are adhered to.

**SECTION 2. Job Notice.**

It is further agreed that the Employer for the period of this Agreement, will notify the office of District Council No. 51 of every job that the Employer has undertaken or contracted to perform under the terms of this Agreement. The job notice to District Council No. 51 shall show the name of the job, location, description of the job, approximate starting and completion dates, and approximate number of men that will be required. The job notice is to be sent to District Council No. 51's office as soon as such fact is known to the Employer or no later than seventy-two (72) hours from the date of the award of the contract to the Employer.

**SECTION 3.** All journeypersons and apprentices shall be dressed and prepared to start work at the established starting time. All journeypersons and apprentices shall be allowed sufficient time before meal time and quitting time for the purpose of placing material and equipment where they properly belong and be allowed sufficient time to clean up and change before quitting time.

**SECTION 4.** The parties agree that no journeyperson or apprentice will be required to haul materials in his privately owned vehicle which exceed ten (10) pounds in weight.

**SECTION 5.** The Contractor agrees that when an employee is laid off he shall immediately be paid off in full. If an employee is laid off and is not paid in full he will receive four (4) additional hours pay at the regular straight time rate, provided the employee is on the job at quitting time on

the last working day prior to layoff. If the employee still does not receive his pay within 24 hours after initial lay off the employee will receive four (4) additional hours compensation at the regular straight time rate, and four (4) additional hours for every 24 hour period of waiting time thereafter. In the event that there are problems when checks are mailed in lieu of hand delivering them to the jobsite, each occurrence will be considered to determine whether the above conditions apply.

If an employee should voluntarily quit or be discharged for just cause he will receive his pay at the end of the next regularly scheduled pay period. If not received on their regular pay day then they will be entitled to receive four (4) additional hours pay at the regular straight time rate for each twenty-four (24) hour period they do not receive their pay, unless in possession of company equipment and/or materials. The employee shall be paid when said equipment and/or materials are returned to the Company.

**SECTION 6.** Any Employer requesting the Union to furnish a member or telling a member to report for work, and failing to place them on job, shall pay employee reporting time on the basis of straight time for four (4) hours pay, except when weather conditions shall not permit job to start.

**SECTION 7.** All employees are entitled to one (1) ten (10) minute coffee break and half hour lunch period per shift. The lunch period is to be taken unless at management's discretion a change is permissible and such change is also agreed upon by everyone that works on that job. There shall be no retaliation against those that do not wish to forego a change to their lunch period.

**SECTION 8.** The Employers further agree to always request free parking on the job-site from the Developer or General Contractor for all employees working on the job-site.

**SECTION 9.** All employees' work clothes shall consist of clean, white painters' clothing, including overalls and pants with no advertisement, except the logo of the Union and/or the Employer.

**SECTION 10.** Employers will furnish all tools with the exception of the employees' standard hand tools.

**SIGNATURE PAGE**
**IUPAT District Council 51**
**Collective Bargaining Agreement**
**June 1, 2006 through May 31, 2010**

**IN WITNESS WHEREOF** the parties hereto have set their hands and seals this _____ day
in the month of _____ in the year _____ to be effective as of the effective date
except as to those provisions where it has been otherwise agreed between the parties.

_____

Employer – Corporate or Company Name (Please Print)

_____

Address

_____

City                                      State                          Zip

_____

Phone Number  /  Fax Number  /  E-mail

_____

Tax I.D. No.

_____

Workmen's Compensation Insurance Company

_____

Workmen's Compensation Insurance Policy Number  /  Expiration Date of Workmen's Compensation Policy

_____

Employer (Print Name and Title)

_____

Employer Signature

_____

Union Representative (Print Name and Title)

_____

Union Representative Signature

# Associate Hourly Billing Rates by Region



| | Median | 90th Percentile |
|---|---|---|
| New England | $185 | $250 |
| Middle Atlantic | $195 | $273 |
| South Atlantic | $190 | $270 |
| E. So. Central | $170 | $220 |
| W. So. Central | $175 | $240 |
| E. No. Central | $180 | $275 |
| W. No. Central | $145 | $190 |
| Mountain | $175 | $250 |
| Pacific | $195 | $290 |

☐ Median
■ 90th Percentile

See following page for states included in each region.

Source: Altman Weil Survey of Law Firm Economics 2005 Edition

PLAINTIFF'S EXHIBIT
5



Census Regions and Divisions of the United States

# Median Hourly Billing Rates
## Litigation Specialties



Top Five
Hourly Rates

Equity and
Non-Equity
Partners

Source: Altman Weil Survey of Law Firm Economics
2005 Edition



**OSBA**

# THE 2004 ECONOMICS OF LAW PRACTICE IN OHIO SURVEY

### Introduction

During the spring of 2004, the Ohio State Bar Association, Section on Solo, Small Firms and General Practice (OSBA) surveyed the Ohio legal community on the economics of law practice. Two online surveys were utilized, replacing the single mail-based survey instrument provided in past years.

With respect to the economics of law practice, similar studies were undertaken in 2001, 1998, 1994 and 1990. The objectives of these studies were to determine, among other things:

- current demographics of practicing attorneys;

- attorney net income by practice category, gender, field of law, office location, work status, years in practice and firm size;

- associate, legal assistant, and secretary compensation by years of experience and office location;

- prevailing average hourly billing rates for attorneys by a variety of indicators, and rates for legal assistants by years of experience, firm size and office location;

- attorney time allocated to billable and non-billable professional activities; and

- overhead expenses associated with maintaining a private practice by office location and firm size.

Attorneys can compare themselves and their firms against "norms" established by the aggregation of survey data. Time series information is also provided to denote trends. Norms include statistics that are organized by combinations of office location, firm size, gender, work status (full-time vs. part-time), practice class, area of legal concentration and years of practice.

The above information has been consolidated into this reference to help guide attorneys as they plan and manage their professional lives.

For 2004, a survey dedicated to law office technology and marketing issues was also fielded at the same time as the economics survey. Findings from this survey are summarized as Current Issues on Law Office Technology and Marketing in Ohio, 2004 and are available at www.ohiobar.org

© 2004 Ohio State Bar Association. All rights reserved.

1

*Economics of Law Practice in Ohio • 9*



PLAINTIFF'S
EXHIBIT
6

## IV.    BILLING RATES AND PRACTICES

A.    Takeaways.

1.    The median hourly billing rate for all attorneys was *$175* for 2004 and *$110* for 1994. The average annual rate of increase in hourly billing rates during this time period was *5.9%*.

2.    Rates have increased the most in *suburban Cincinnati* (7.3% per year) and least in *suburban Columbus* (2.5%).

3.    Rates increased most for *partners in firms with 8+ partners* (5.9%) and least for *partners in firms with two to seven partners* (3.7%).

4.    *Rates increased the most for respondents in* firms with two to five attorneys (6.05%) and least for respondents in *firms with more than 20 attorneys* (4.2%).

5.    Rates increased the most for *estate planning attorneys* (9.5%) and *tax attorneys* (7.6%) and least for *bankruptcy* (2%) and *municipal/public entity* attorneys (– 1%).

6.    Fifty-six percent of respondents had *not changed* their rates in one year or more.

7.    When rates are raised, the prevalent increase is *6-10%* (41% of respondents).

8.    *Uncollectibles* (greater than 2% of fees billed) are increasing. The prevalent range is *3-8% of fees billed* (33% in 2004 and 30% in 2000).

9.    Attorneys are *increasingly adding service charges* to delinquent accounts where applicable (30% in 2004 compared with 20% in 1990).

B.    Implications.

1.    There is still pricing power for legal services despite intense competition and an ever growing supply of attorneys.

2.    Existing and new practice management benchmarks should be available, especially for solos and small firm practicing attorneys, to enable relative standing self assessments.

## V.    ATTORNEY TIME ALLOCATIONS

A.    Takeaways.

1.    The median value for *total hours* worked in 2004 rose to *50* from *48* in 1990 (2500 hours per year on a 50-week year).

**Law Firm Billing Rates and Billing Practices**

## 2004 Attorney Hourly Billing Rates

The reported 2004 median hourly billing rate is $200. The average is $206. While several interacting factors affect the setting and application of hourly billing rates, Exhibit 21 includes three discrete factors: respondents' firm size, years in practice and office location, while Exhibit 22 identifies respondents' primary source of income, and practice category.

**Exhibit 21    2004 HOURLY BILLING RATES BY FIRM SIZE, YEARS IN PRACTICE AND OFFICE LOCATION**

| | | Value by Percentile | | | |
|---|---|---|---|---|---|
| Size of Firm | N | Mean | 25th | Median | 75th | 95th |
| 1 | 196 | $155 | $125 | $150 | $175 | $225 |
| 2 | 55 | 164 | 125 | 150 | 185 | 250 |
| 3-6 | 77 | 176 | 150 | 175 | 200 | 256 |
| 7-10 | 40 | 196 | 150 | 180 | 244 | 300 |
| 11-20 | 39 | 189 | 155 | 195 | 225 | 275 |
| 21-50 | 49 | 206 | 163 | 200 | 238 | 320 |
| 51+ | 72 | 249 | 186 | 240 | 300 | 377 |
| **Yrs. in Practice** | | | | | | |
| 5 or less | 70 | $147 | $125 | $143 | $175 | $222 |
| 6-10 | 78 | 164 | 125 | 150 | 190 | 250 |
| 11-15 | 65 | 185 | 150 | 180 | 228 | 296 |
| 16-25 | 131 | 184 | 150 | 165 | 220 | 306 |
| More than 25 | 183 | 200 | 150 | 190 | 230 | 340 |
| **Office Location** | | | | | | |
| Greater Cleveland | 121 | $200 | $150 | $185 | $238 | $350 |
| Greater Cincinnati | 61 | 199 | 150 | 180 | 245 | 325 |
| Greater Columbus | 120 | 194 | 150 | 180 | 233 | 300 |
| Greater Dayton | 25 | 179 | 150 | 175 | 193 | 296 |
| Northeast Region | 98 | 165 | 125 | 163 | 196 | 250 |
| Northwest Region | 47 | 152 | 120 | 150 | 175 | 263 |
| Southern Region | 56 | 155 | 125 | 150 | 175 | 250 |
| | | | | | | |
| Downtown Cleveland | 61 | $237 | $183 | $235 | $283 | $359 |
| Suburban Cleveland | 60 | 161 | 150 | 150 | 189 | 220 |
| Downtown Cincinnati | 40 | 213 | 153 | 200 | 271 | 368 |
| Suburban Cincinnati | 21 | 173 | 145 | 175 | 183 | 249 |
| Downtown Columbus | 67 | 217 | 165 | 210 | 260 | 334 |
| Suburban Columbus | 53 | 164 | 145 | 150 | 200 | 243 |
| Dayton | 25 | 179 | 150 | 175 | 193 | 296 |
| Canton | 12 | 154 | 116 | 153 | 183 | 250 |
| Akron | 41 | 186 | 150 | 190 | 223 | 273 |
| Toledo | 26 | 170 | 144 | 168 | 186 | 285 |
| Youngstown | 9 | 146 | 113 | 150 | 178 | 200 |
| Northeast Ohio | 36 | 149 | 125 | 138 | 188 | 225 |
| Northwest Ohio | 21 | 129 | 100 | 125 | 150 | 180 |
| Southeast Ohio | 16 | 155 | 125 | 150 | 188 | 250 |
| Southwest Ohio | 25 | 146 | 125 | 150 | 170 | 207 |
| Central Ohio | 15 | 171 | 150 | 165 | 185 | 250 |
| All Attorneys | 530 | $182 | $150 | $175 | $210 | $300 |

**Exhibit 22     2004 HOURLY BILLING RATES BY PRIMARY FIELD OF LAW AND PRACTICE CLASS**

| Primary Field of Law | N | Mean | 25th | Median | 75th | 95th |
|---|---|---|---|---|---|---|
| | | | Value by Percentile | | | |
| Administrative Law | 5 | $241 | $188 | $260 | $285 | $295 |
| Bankruptcy, Debtor | 18 | 135 | 115 | 150 | 168 | 190 |
| Collections | 10 | 146 | 119 | 135 | 164 | 250 |
| Corporate/Business Law | 48 | 201 | 150 | 183 | 225 | 340 |
| Criminal (Public Defendant) | 9 | 139 | 100 | 125 | 175 | 225 |
| Criminal (Private Defendant) | 12 | 154 | 125 | 150 | 173 | 250 |
| Domestic Relations/Family Law | 55 | 173 | 125 | 150 | 200 | 280 |
| Environmental Law/Natural Resources Law | 6 | 200 | 151 | 168 | 283 | 305 |
| General Practice | 14 | 136 | 118 | 132 | 161 | 185 |
| Health & Hospital Law | 6 | 203 | 148 | 195 | 263 | 300 |
| Intellectual Property | 10 | 216 | 174 | 223 | 250 | 300 |
| Labor Law (Management) | 6 | 185 | 150 | 168 | 236 | 255 |
| Employment Law (Management) | 25 | 187 | 138 | 175 | 238 | 324 |
| Employment Law (Labor) | 6 | 178 | 151 | 175 | 208 | 230 |
| Municipal/Public Entity Law | 8 | 164 | 111 | 138 | 225 | 305 |
| Product Liability | 5 | 226 | 138 | 205 | 325 | 425 |
| Personal Injury (Defendant) | 25 | 148 | 110 | 135 | 175 | 270 |
| Personal Injury (Plaintiff) | 43 | 179 | 150 | 160 | 200 | 300 |
| Professional Liability | 6 | 164 | 149 | 165 | 178 | 185 |
| Real Property Law | 26 | 164 | 125 | 150 | 195 | 315 |
| Taxation | 7 | 231 | 175 | 220 | 295 | 300 |
| Trial Practice, not PI (General Civil) | 20 | 190 | 140 | 177 | 200 | 415 |
| Trial Practice, not PI (Commercial) | 20 | 224 | 181 | 210 | 276 | 387 |
| Estate Planning/Wealth Management | 36 | 209 | 175 | 205 | 233 | 308 |
| Probate, Decedents' Estates | 49 | 176 | 150 | 175 | 200 | 250 |
| Workers' Compensation (Plaintiff) | 6 | 167 | 125 | 150 | 213 | 250 |
| Other | 23 | 200 | 150 | 190 | 250 | 358 |
| **Practice Classification** | | | | | | |
| Sole Practitioner | 168 | $153 | $125 | $150 | $175 | $225 |
| Solo with 1+ associates | 42 | 181 | 150 | 175 | 203 | 259 |
| Space Sharer | 21 | 160 | 125 | 150 | 175 | 275 |
| Partner in Firm with 2-7 Partners | 114 | 184 | 150 | 175 | 221 | 300 |
| Partner in Firm with 8+ Partners | 88 | 249 | 196 | 240 | 300 | 381 |
| Associate in Firm with 2-7 Partners | 31 | 156 | 125 | 150 | 175 | 264 |
| Associate in Firm with 8+ Partners | 56 | 180 | 150 | 175 | 210 | 263 |
| All Attorneys | 530 | $182 | $150 | $175 | $210 | $300 |

## Hourly Billing Rates for Associates and Legal Assistants

The distribution of hourly billing rates for associates and legal assistants are summarized by years of experience in Exhibit 23, by office location (Exhibits 24 and 25), and by firm size (Exhibits 26 and 27).

Exhibit 26    **DISTRIBUTIONS OF 2004 HOURLY BILLING RATES FOR ASSOCIATES BY FIRM SIZE AND YEARS OF EXPERIENCE**

| Associate Billing Rate Category | Firm Size (Number of Attorneys) | | | | |
|---|---|---|---|---|---|
| | 2 | 3-6 | 7-20 | 21+ | All |
| **No Experience** | | | | | |
| <$135 | 57.9 | 78.1 | 69.0 | 43.5 | 61.9 |
| $136-145 | 15.8 | 9.4 | 10.3 | 19.6 | 13.5 |
| $146-155 | 15.8 | 9.4 | 17.2 | 19.6 | 16.1 |
| $156-165 | | | 1.7 | 6.5 | 2.6 |
| $166-175 | 10.5 | | 1.7 | 4.3 | 3.2 |
| $176-199 | | | | 6.5 | 1.9 |
| $225-249 | | 3.1 | | | 0.6 |
| Total | 100% | 100% | 100% | 100% | 100% |
| **3 Years Experience** | | | | | |
| <$135 | 43.8 | 35.3 | 39.0 | 13.0 | 31.0 |
| $136-145 | 18.8 | 20.6 | 22.0 | 19.6 | 20.6 |
| $146-155 | 25.0 | 29.4 | 20.3 | 21.7 | 23.2 |
| $156-165 | | 11.8 | 6.8 | 13.0 | 9.0 |
| $166-175 | 6.3 | 2.9 | 6.8 | 23.9 | 11.0 |
| $176-199 | 6.3 | | 5.1 | 8.7 | 5.2 |
| Total | 100% | 100% | 100% | 100% | 100% |
| **5 Years Experience** | | | | | |
| <$135 | 12.5 | 24.0 | 25.0 | 4.3 | 16.9 |
| $136-145 | 25.0 | 8.0 | 10.7 | 10.6 | 11.0 |
| $146-155 | 12.5 | 40.0 | 25.0 | 10.6 | 22.1 |
| $156-165 | 12.5 | 12.0 | 17.9 | 17.0 | 16.2 |
| $166-175 | | 16.0 | 10.7 | 10.6 | 11.0 |
| $176-199 | 12.5 | | 10.7 | 29.8 | 15.4 |
| $200-224 | 25.0 | | | 14.9 | 6.6 |
| $225-249 | | | | 2.1 | 0.7 |
| Total | 100% | 100% | 100% | 100% | 100% |
| **10 Years Experience** | | | | | |
| <$135 | 33.3 | 14.8 | 19.5 | 5.4 | 14.9 |
| $136-145 | 11.1 | | 4.9 | 2.7 | 3.5 |
| $146-155 | | 22.2 | 14.6 | 5.4 | 12.3 |
| $156-165 | 22.2 | 7.4 | 4.9 | 5.4 | 7.0 |
| $166-175 | | 14.8 | 14.6 | 16.2 | 14.0 |
| $176-199 | | 18.5 | 26.8 | 18.9 | 20.2 |
| $200-224 | 22.2 | 18.5 | 14.6 | 18.9 | 17.5 |
| $225-249 | 11.1 | 3.7 | | 10.8 | 5.3 |
| $250+ | | | | 16.2 | 5.3 |
| Total | 100% | 100% | 100% | 100% | 100% |

**Exhibit 27**     **DISTRIBUTIONS OF 2004 HOURLY BILLING RATES FOR LEGAL ASSISTANTS BY FIRM SIZE AND EXPERIENCE**

| Legal Assistant Billing Rate Category | Firm Size (Number of Attorneys) | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2 | 3-6 | 7-20 | 21+ | All Firms |
| **No Experience** | | | | | |
| $50 or less | 40.0 | 60.0 | 50.0 | 20.0 | 41.0 |
| $51-60 | 30.0 | 20.0 | 20.0 | 17.1 | 20.0 |
| $61-70 | 10.0 | 4.0 | 10.0 | 5.7 | 7.0 |
| $71-80 | 20.0 | 8.0 | 10.0 | 25.7 | 16.0 |
| $81-90 | | 4.0 | 10.0 | 8.6 | 7.0 |
| $91-100 | | 4.0 | | 17.1 | 7.0 |
| $101-110 | | | | 5.7 | 2.0 |
| Total | 100% | 100% | 100% | 100% | 100% |
| **3 Years Experience** | | | | | |
| $50 or less | 12.5 | 25.0 | 13.3 | 2.8 | 11.7 |
| $51-60 | 62.5 | 35.0 | 23.3 | 11.1 | 24.5 |
| $61-70 | | 20.0 | 26.7 | 22.2 | 21.3 |
| $71-80 | | 10.0 | 13.3 | 11.1 | 10.6 |
| $81-90 | 12.5 | 5.0 | 10.0 | 22.2 | 13.8 |
| $91-100 | 12.5 | | 10.0 | 8.3 | 7.4 |
| $101-110 | | 5.0 | 3.3 | 8.3 | 5.3 |
| $111-120 | | | | 11.1 | 4.3 |
| >$120 | | | | 2.8 | 1.1 |
| Total | 100% | 100% | 100% | 100% | 100% |
| **5 Years Experience** | | | | | |
| $50 or less | 16.7 | 4.5 | 8.6 | 2.9 | 6.2 |
| $51-60 | | 27.3 | 17.1 | 5.9 | 14.4 |
| $61-70 | 66.7 | 22.7 | 11.4 | 14.7 | 18.6 |
| $71-80 | 16.7 | 31.8 | 34.3 | 11.8 | 24.7 |
| $81-90 | | 4.5 | 14.3 | 11.8 | 10.3 |
| $91-100 | | | 11.4 | 17.6 | 10.3 |
| $101-110 | | 9.1 | | 11.8 | 6.2 |
| $111-120 | | | | 11.8 | 4.1 |
| >$120 | | | 2.9 | 11.8 | 5.2 |
| Total | 100% | 100% | 100% | 100% | 100% |
| **10 Years Experience** | | | | | |
| $50 or less | 20.0 | | 2.7 | 3.0 | 3.9 |
| $51-60 | 20.0 | 9.1 | 18.9 | 3.0 | 11.8 |
| $61-70 | | 13.6 | 13.5 | 12.1 | 11.8 |
| $71-80 | 30.0 | 40.9 | 18.9 | 6.1 | 20.6 |
| $81-90 | 10.0 | 18.2 | 21.6 | 6.1 | 14.7 |
| $91-100 | | 13.6 | 16.2 | | 14.7 |
| $101-110 | | 4.5 | | 12.1 | 4.9 |
| $111-120 | 20.0 | | 5.4 | 18.2 | 9.8 |
| >$120 | | | 2.7 | 21.2 | 7.8 |
| Total | 100% | 100% | 100% | 100% | 100% |

Exhibit 28 displays the impact of firm size on methods for client billing for legal assistants:

**Exhibit 28**     **LEGAL ASSISTANT CLIENT BILLING METHODS BY SIZE OF FIRM, 2004**

| Billing Method for Legal Assistants | Firm Size (Number of Attorneys) | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 1 | 2 | 3-6 | 7-20 | 21+ | All Firms |
| Included with Attorney Fee | 47.1 | 59.5 | 39.7 | 19.7 | 4.7 | 32.1 |
| Time | 42.9 | 35.1 | 55.2 | 73.8 | 87.5 | 60.7 |
| Fee Schedule | 8.6 | 5.4 | 5.2 | 3.3 | 6.3 | 5.9 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |